John Adams Moore, Jr.
Adam Moore Law Firm
217 North Second Street
Yakima, WA 98901
(509) 575-0372
Fax: (509) 452-6771
Email: mooreadamlawfirm@qwestoffice.net

Randolph H. Barnhouse
Johnson Barnhouse & Keegan LLP
7424 4th Street N.W.
Los Ranchos de Albuquerque, NM 87107
Telephone:  (505) 842-6123
Fax:  (505) 842-6124
dbarnhouse@indiancountrylaw.com
(pro hac vice)


Attorneys for Defendant / Counter Plaintiff
King Mountain Tobacco Co., Inc.

HONORABLE ROSANNA M. PETERSON

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  CV-12-3089-RMP |
| Plaintiffs/Counter Defendant, | **DEFENDANT/COUNTER PLAINTIFF KING MOUNTAIN TOBACCO CO., INC.'S RESPONSE IN OPPOSITION TO U.S. MOTION FOR SUMMARY JUDGMENT ON ISSUE 1** |
| vs. | |
| KING MOUNTAIN TOBACCO CO., INC., | |
| Defendants/Counter Plaintiff. | **DATE:  July 30, 2014** |
| | **TIME:  9:30 a.m.** |
| | **With Oral Argument** |

# INTRODUCTION

Plaintiff moved for summary judgment on all issues in this case, including the specific amount of the tax, penalties and interest it claims are owed by King Mountain "for various tax periods beginning September 1, 2009 and ending July 31, 2013." ECF No. 48 at 5. The Court stayed consideration of the specific amount of tax, penalties and interest due, but proceeded on the remaining issues raised in the motion for summary judgment, granting judgment to Plaintiff on King Mountain's General Allotment Act and Yakama Treaty defenses. ECF No. 62. Plaintiff then renewed its motion for summary judgment as to the amount of taxes, penalties and interest that should be assessed against King Mountain. ECF No. 70. However, since filing its original motion for summary judgment [ECF No. 48], Plaintiff has both modified the figures it provided in support of its motion for summary judgment, and has agreed in a separate forfeiture action to reduce King Mountain's excise tax assessment by an undetermined amount. Based on the evidence before the Court, it is impossible to determine what amount it is that Plaintiff claims is owed by King Mountain. Moreover, genuine issues of material fact exist requiring factual determinations on King Mountain's advice of counsel and estoppel defenses to penalties and interest, all requiring denial of the pending motion for summary judgment.

# ARGUMENT

## I.  Genuine Issues of Material Fact Preclude Entry of Summary Judgment.

The United States, as plaintiff, bears the burden of proof in this action. 14 Merten's Law of Fed. Income Tax'n § 49E:54 ("In an action by the government for the collection of a tax, the burden of proof is upon the United States under the rule that the party who alleges, must prove."). As the movant for summary judgment, Plaintiff bears the additional burden of showing not only the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), but also of demonstrating that there is an absence of evidence to support Defendant's case.

*Id.* at 325.  The Court draws all reasonable inferences in favor of King Mountain as the nonmoving party.  *Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010).

Drawing all reasonable inferences in favor of King Mountain confirms that Plaintiff has not shown the absence of a genuine issue of material fact, and has not demonstrated an absence of evidence to support King Mountain's defenses.  All Plaintiff has done is provide the Court with a total dollar amount of taxes, penalties and interest combined, without addressing the specific requirements it must show to assess penalties and interest, and without addressing King Mountain's defenses to the assessment of a portion of the taxes claimed, and defenses to imposition of penalties and interest.  Absent that showing, the motion for summary judgment is deficient, and must be denied.

## II.    Plaintiff's "Blue Ribbon Transcript" Is Not Reliable Evidence of the Amount King Mountain Owes.

King Mountain concedes that unless the Court revisits and modifies its interlocutory order (ECF No. 62), it will liable for some amount of federal excise tax upon final judgment from the Court.  At this time, however, the amount of federal excise tax, interest and penalties (if any) is uncertain, disputed, and requires trial on the merits.  Plaintiff's motion asserts that it is "entitled to judgment for the unpaid assessed balances" contained in its Blue Ribbon Transcript and that "[a]ll assessments, payments, credits, and other relevant activity are accounted for" in the Blue Ribbon Transcript.  ECF No. 48 at pp. 5-6 citing *United States v. Chila*, 871 F.2d 1015 (11th Cir. 1989).  In *Chila*, the court only accepted a "Certificate of Assessments and Payments" as presumptive because there was *no* evidence it was inaccurate.  *Id.* at 1018 ("'the defendant has produced *no* evidence to counter this presumption" (emphasis in original) (citing and quoting *United States v. Dixon*, 672 F. Supp. 503, 506 (11th Cir. 1988)).  That is not true here.

Since the filing of its summary judgment and submission of the Blue Ribbon Transcript, Plaintiff has corrected its Final Notice & Demand of Taxes Due to

substantially alter the amount of assessed federal excise tax, penalties, and interest. Additionally, Plaintiff has since obtained a judgment in forfeiture recognizing a remission in an uncertain amount that will reduce the amount Plaintiff is seeking in this action.

First, after filing its motion for summary judgment, Plaintiff issued a "Second Corrected Final Notice & Demand of Taxes Due Notice of Intent to Levy" (dated February 25, 2014) that altered the total Plaintiff asserts King Mountain owes in Federal Excise Tax and penalties. *See* King Mountain Tobacco Co., Inc.'s Supplemental Response to the United States Statement of Facts and Additional Statement of Facts (hereinafter "SOF") ¶ 2. The Second Corrected Final Notice specifically claims to "correct the liability assessed for May and June 2010." *Id.* Due to this correction, the total amount of tax, penalties, and interest have been substantively modified from the Blue Ribbon Transcript, rendering it inaccurate. In its motion for summary judgment, Plaintiff argues that the Blue Ribbon Transcript bears a "presumption of correctness." ECF No. 48 at p. 6. Moreover, Plaintiff asserts that "[a]ll the payments, credits, and other relevant account activity are accounted for." *Id.* at p. 5. Even if true at the time, this is no longer true based on Plaintiff's own actions. A genuine issue of material fact remains regarding the amount King Mountain owes in tax, penalties, and interest. This issue alone requires that the Plaintiff's motion for summary judgment be denied.

Additionally, in a related forfeiture case, Plaintiff applied for and has been granted a remission of "no less than $5,000,000.00" of funds seized by the federal government. *See* SOF ¶ 2. These funds are derived from payments seized from FB Enterprises, LLC – funds that Plaintiff acknowledges were "designated or held as payment for King Mountain." *Id.* at p. 3. Due to remission of these funds for payment of King Mountain's liability to Plaintiff, the Blue Ribbon Transcript and the Second Corrected Final Notice do not accurately reflect the unpaid assessed balance of tax, penalties, and interest sought by Plaintiff. As a result, genuine

issues remain that require trial on the merits and denial of Plaintiff's motion for summary judgment.

**III.    Genuine Issues of Material Fact Remain as to Whether Plaintiff Should Be Estopped From Charging King Mountain Penalties and Interest, or Collecting Taxes on Cigarettes It Conspired to Have Taken Without Payment and Sold for the Benefit of the Government.**

The estoppel doctrine is applicable to the United States where required by "justice and fair play."  *United States v. Lazy FC Ranch*, 481 F.2d 985, 988-89 (9th Cir. 1973) ("This court has also followed this rationale and permitted the estoppel defense against the government in cases where basic notions of fairness required us to do so").[1]  The Ninth Circuit has confirmed that estoppel is particularly appropriate against the government in its dealings with Native Americans:

> our government has an overriding duty of fairness when dealing with Indians, one founded upon a relationship of trust for the benefits of these '. . . dependent and sometimes exploited people.'

*Fox v. Morton*, 505 F.2d 254, 255 (9th Cir. 1974) (applying equitable estoppel to government action) (*citing and quoting Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)).

When addressing an estoppel defense to an affirmative government claim the Court must consider the traditional estoppel elements. *United States v. Georgia-Pac. Co.*, 421 F.2d 92, 96 (9th Cir. 1970).  Additionally:

> Before the government will be estopped, however, two additional elements must be satisfied beyond those required for traditional estoppel.  First, "[a] party seeking to raise estoppel against the government must establish 'affirmative misconduct going beyond mere negligence'; even then, 'estoppel will only apply where the government's wrongful act will cause a serious injustice, and the

---

[1] As an affirmative defense, estoppel may be raised in motions for summary judgment and need not be raised in the answer.  *See Healy v. Tibbitts Constr. Co. v. Insurance Co. of N. Am.*, 679 F.2d 803, 804 (9th Cir. 1982) (per curiam); *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984).

public's interest will not suffer undue damage by imposition of the liability.'"

*Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (affirming estoppel of government action) (citations omitted); *see also United States v. Georgia-Pac. Co.*, 421 F.2d at 96 (affirming estoppel of government action); David K. Thompson, *Equitable Estoppel of the Government*, 79 Colum. L. Rev. 551 (1979).

The government's conduct here exceeds the requirements necessary for imposition of equitable estoppel against it. At a time when King Mountain was current on its accruing FET obligations, the government entered into a clandestine deal with a King Mountain distributor to deny King Mountain the cash flow it needed to stay current on its financial obligations including federal taxes. Under the government's deal:

1.  The distributor would order cigarettes from King Mountain. SOF ¶ 17.

2.  The distributor would not pay King Mountain for the cigarettes. SOF ¶¶ 20, 24.

3.  The distributor would sell the King Mountain cigarettes at a price set by the government. SOF ¶ 21.

4.  Once the distributor had cash on hand to pay King Mountain, it would notify the government and the government would take the money:

    [US Attorney] **MR. LAMAR:** "[the distributor is] not – he's not failing to pay King Mountain. We're seizing it before he can.

    **THE COURT:** Say that to me again.

    **MR. LAMAR:** He is not refusing to pay King Mountain. We are seizing the King Mountain payment before he can make it.

    **THE COURT:** Right.

    SOF ¶¶ 24-27.

5.  Plaintiff did this to bring "the King Mountain people to their knees." SOF ¶ 25.

6. Plaintiff did this because King Mountain was "a thorn in the side of the tobacco industry."  SOF ¶ 26.

In other words, instead of stopping shipments it claimed were illegal, the government conspired to have King Mountain continue to ship cigarettes week after week, starving for cash flow, with the government knowing that its deal would damage King Mountain beyond repair.  Plaintiff's goal was to "bring King Mountain to its knees."  And it did this not for any public policy reason, but instead because King Mountain was a "thorn in the side" of the major tobacco companies.

Plaintiff's conduct was not limited to this case.  What it did here is consistent with other efforts that have been condemned by the government's Inspector General's Office.  *See* USDOJ Office of the Inspector General, Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Use of Income-Generating, Undercover Operations, Audit Report 13-36 (Sept. 2013), available at www.justice.gov/oig/reports/2013/a1336.pdf.  Just by way of example, the IGO report:

> identified one churning investigation that was never authorized by ATF Headquarters or the Department.  The unauthorized churning investigation sold approximately $15 million of cigarettes in an 18-month period.  We further found that this investigation did not operate within ATF's framework for managing churning investigations, and that it exceeded ATF's statutory authority to conduct such investigations.  Additionally, we found that the confidential informant was allowed to keep more than $4.9 million of the $5.2 million of gross profit generated from sales of tobacco to criminal targets.

*Id.* at ii.

Whether estoppel is appropriate is fact specific.  *See Georgia-Pac. Co.*, 421 F.2d at 96.  Here, the facts are at least sufficient to warrant a trial on this issue.

(1) The federal government **knew the facts** – it was allowing its contract partner to receive and sell cigarettes on which no Federal Excise Tax had been paid, and was cooperating with its contract partner to ensure

King Mountain would never be paid, in order to bring King Mountain "to its knees." SOF ¶¶ 24, 25.

(2) The federal government **intended** that its arrangement with its contract partner not be known by King Mountain so that King Mountain would continue shipping cigarettes to the government's contract partner. SOF ¶ 27.

(3) King Mountain was **ignorant of the true facts**, believing that its ongoing shipments of cigarettes would be paid for in a timely fashion, as they had been for years before the federal government cut its deal with the distributor. SOF ¶ 20.

(4) King Mountain **relied** to its injury – it relied on getting payment for all shipped product, and relied on the government not to contractually arrange to allow King Mountain's product to be stolen so that the government would receive sale proceeds instead of having those go to King Mountain: "He is not refusing to pay King Mountain. We are seizing the King Mountain payment before he can make it." SOF ¶¶ 19, 24-27.

Second, there is evidence sufficient to raise a genuine issue of material fact regarding the government's affirmative misconduct going beyond mere negligence. This alone requires denial of the Plaintiff's motion for summary judgment. As the Ninth Circuit Court of Appeals has confirmed:

> There is no single test for detecting the presence of affirmative misconduct; *each case must be decided on its own particular facts and circumstances*. Affirmative misconduct does require an affirmative misrepresentation or affirmative concealment of a material fact by the government, although it does not require that the government intend to mislead a party.

*Watkins v. U.S. Army*, 875 F.2d 699, 707, (9th Cir. 1989) (emphasis added) (internal citations omitted). By its own admission the government acted to "bring King Mountain to its knees." SOF ¶ 25. It did so not by pursuing King Mountain

directly, but instead by cutting a clandestine side deal under which the government would profit from the sale of untaxed King Mountain cigarettes at the expense of King Mountain, and it did so because King Mountain was a "thorn in the side of the tobacco industry."  SOF ¶ 26.

And third, the government's wrongful conduct if allowed to form the basis for penalties and interest charges will cause a serious injustice.  Specifically, the government's actions triggered an avalanche of problems for King Mountain by denying it the cash flow required to pay its debts including taxes and escrow deposits.  The litigation in which the parties are engaged, and cases still pending in at least three state courts, all developed as a result of the government's clandestine deal to deny King Mountain cash flow by taking King Mountain cigarettes and having them sold for the government's account.  Moreover, the public's interest will not suffer undue damage if the government is not able to collect penalties against King Mountain, is not able to collect interest against overdue taxes triggered by the government's clandestine deal, or is not allowed to collect taxes on cigarettes the government's contract partner sold for the government's benefit without payment to King Mountain.  King Mountain is willing to pay all FET on cigarettes it sold for its benefit. It should not be required to pay FET on cigarettes that the government's contract partner took without paying King Mountain and sold at the government's instruction and for the government's benefit.

At a minimum, the government's clandestine deal raises genuine issues of material fact sufficient to preclude summary judgment in its favor.  Basic notions of fairness require this Court to hear witness testimony and consider all facts necessary for the Court to determine whether the misconduct by the Plaintiff should prevent it from:  (1) collecting taxes on cigarettes it "arranged" to have taken without payment and sold for profit; (2) collecting penalties for nonpayment when the reason for nonpayment was the Plaintiff's own improper dealings; and

(3) collecting interest on FET not paid when the reason for nonpayment was a side deal benefitting Plaintiff at the expense of King Mountain.

## IV. Genuine Issues of Material Fact Remain as to Whether King Mountain's Reliance on the Substantive Legal Advice of Counsel Constituted "Reasonable Cause" Such That Plaintiff Cannot Collect Penalties.

In this suit, the Plaintiff seeks to impose "failure to file," "failure to pay," and "failure to deposit" penalties under 26 U.S.C. §§ 6651(a)(1) & (2), 6656(a). Each of these penalties "shall be added" to the tax, "**unless** it is shown that such failure is due to reasonable cause and not due to willful neglect." *Id.* (emphasis added).  In this case, the Plaintiff's assessment of penalties is improper not only because of estoppel, but also because any failure by King Mountain to file or pay federal excise taxes was wholly due to King Mountain's good faith reliance on competent legal advice, and such advice constituted "substantive advice" on a question of law.  *See, e.g. United States v. Boyle*, 469 U.S. 241, 250 (1985) ("'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney"); *Knappe v. United States*, 713 F.3d 1164, 1170 (9th Cir. 2013) (citing cases for the proposition that "whether a return is due is a matter of substantive tax law, and that a taxpayer acts with ordinary business care and prudence when he relies on an expert's answer to that question").  As a result, King Mountain's reliance on such legal advice constituted reasonable cause and not wilful neglect, and is sufficient to abate the penalties sought by the Plaintiff here.

Courts have "frequently held that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." *Boyle*, 469 U.S. at 250 (1985) (citations omitted).  Specifically, the United States Supreme Court has held that "[w]hen an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is

reasonable for the taxpayer to rely on that advice." *Id.* at 251 (emphasis in original). This is because "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." *Id.* "To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id.*

Other courts have acknowledged the general rule for reliance on legal advice as follows:

> While the mere fact that the tax liability of a taxpayer is in substantial doubt does not of itself excuse non-compliance . . . , it is nevertheless the general rule that where such doubt exists and a legal opinion with respect thereto is obtained from competent and reputable counsel, reliance in good faith on such opinion constitutes reasonable cause sufficient to defeat the imposition of delinquency penalties.

*Spouting Rock Beach Corp. v. United States*, 176 F. Supp. 938, 943 (D.R.I. 1959). In *Spouting Rock*, the taxpayer plaintiff "convincingly established that the plaintiff sought and procured the advice of eminently qualified lawyers, and acted strictly in accordance with the advice so obtained." *Id.* The court determined that "[h]aving taken such prudent steps to inform itself as to its tax liability in the premises, it would seem harsh and unrealistic to place upon the plaintiff the additional burden – as the Government suggests – of consulting also with its accountants, who, insofar as the evidence shows, merely prepared its tax returns, but who had never advised it previously on tax matters." *Id.* "The law requires only that a taxpayer show reliance in good faith upon the advice of a practicing lawyer." *Id.* (citations omitted).

The Ninth Circuit has clarified the critical "distinction between substantive and nonsubstantive" legal advice for purposes of determining whether a taxpayer's reliance on such advice constituted reasonable cause sufficient to defeat the imposition of penalties. *Knappe*, 713 F.3d at 1169-70 (9th Cir. 2013). Specifically, reliance on nonsubstantive advice, such as "cases involving taxpayers who delegate the task of filing a return to an expert agent, only to have the agent file the

return late or not at all," is generally insufficient to constitute "reasonable cause." *Id.* at 1169 (citing *Boyle*, 469 U.S. at 251-52).  This is because the statutory filing deadline prescribed by Congress was unambiguous and did not require "special training or effort to ascertain a deadline and make sure that it is met."  *Id.* (quoting *Boyle* at 251-52).

However, where the taxpayer relies on an agent's erroneous advice that no return is due, "a taxpayer acts with ordinary business care and prudence when he relies on an expert's answer to that question."  *Id.* at 1170 (citation omitted). Reliance on advice on a matter of substantive tax law, therefore, constitutes reasonable cause sufficient to defeat the imposition of delinquency penalties.  *Id.*; *see also United States v. Kroll*, 547 F.2d 393, 396 (7th Cir. 1977) (holding that "when there is no question that a return must be filed, the taxpayer has a personal, nondelegable duty to file the tax return when due" and holding that "[w]hether or not the taxpayer is liable for taxes is a question of tax law which often only an expert can answer.  The taxpayer not only can, but must rely on the advice of either an accountant or a lawyer.  This reliance is clearly an exercise of ordinary business care and prudence.").  *Id.*

In its motion for summary judgment, Plaintiff asserts that it is "entitled to judgment for the unpaid assessed balances . . . , together with accrued but unassessed interest and statutory additions."  ECF No. 48 at p. 6.  Plaintiff does not explain to the Court what the "statutory additions" are or why Plaintiff believes they are appropriate here.  Assuming for purposes of this response that "statutory additions" refers to penalties, Plaintiff also does not offer any undisputed or disputed material facts to demonstrate that King Mountain acted without "reasonable cause" or with "willful neglect" sufficient to warrant the imposition of penalties under 26 U.S.C. §§ 6651(a)(1) & (2), 6656(a).

In fact, Plaintiff has been on notice prior to the inception of this lawsuit that King Mountain had substantive legal justification for asserting that no federal

excise tax could be assessed on King Mountain.  Plaintiff has known from the outset that King Mountain was relying on legal advice on the substantive issue that it was entitled to an exemption from the federal excise taxes sought in this action. SOF ¶¶ 32-40.  Until this Court's entry of summary judgment holding that King Mountain is subject to such federal excise taxes, King Mountain's reliance on such advice was reasonable, and not due to willful neglect.

Specifically, the following genuine issues of material fact preclude entry of Plaintiff's requested summary judgment.

(1)  King Mountain consulted with its attorney, Theresa Keyes, K&L Gates, LLP, who offered legal opinion that the protections guaranteed in the Yakama Treaty of 1855, and protections provided by the General Allotment Act to allottee owners of federal trust allotments, rendered King Mountain exempt from paying federal excise taxes.  SOF ¶ 32.

(2)  Due to King Mountain's counsel's expertise in corporate and tax law, it relied on the legal advice and legal justification, and ceased paying FET in August 2011.  SOF ¶ 33.

(3)  On May 24, 2010, the Yakama Nation Tribal Council passed Resolution T-092-10, stating its "considered determination" that KMT is exempt from the federal tobacco excise tax, due to the guarantees and reservations of rights contained in the Treaty of 1855.  SOF ¶ 34.

(4)  This resolution, along with a letter from Yakama Nation Chairman Harry Smiskin, stating the reasons and basis for the exemption, and a memorandum from King Mountain's counsel at the time, K&L Gates, LLP, to Chairman Smiskin on the same topic and a copy of the Treaty of 1855 and the Treaty Council minutes were presented to representatives of

President Obama in the Yakama Nation's attempts to secure government-to-government consultation on this issue.   SOF ¶ 35.[2]

(5)  On February 28, 2011, Irwin Schwartz, counsel for King Mountain, wrote a letter to the Hon. Ronald A. Cimino, Deputy Assistant Attorney General for Criminal Matters, U.S. Department of Justice, Tax Division, reiterating King Mountain's legal claim of entitlement to exemption from the taxes, penalties, and interest sought in this action.  SOF ¶ 36.[3]

(6)  In mid-June of 2011, the National Congress of American Indians ("NCAI"), the largest and oldest intertribal organization in the country, passed Resolution MKE-11-011 (June 13-16, 2011), affirming its understanding that King Mountain is entitled to an exemption from federal tobacco excise taxes because the imposition of such taxes upon King Mountain violates the Treaty of 1855.  SOF ¶ 37.

(7)  Counsel for King Mountain sent a letter to Plaintiff on August 16, 2012 in response to Plaintiff's Notice & Demand of Taxes Due, summarizing, reiterating, and restating its repeated attempts to communicate its entitlement to an exemption from, and a full refund of, all federal excise taxes it has paid to Plaintiff.  SOF ¶ 38.

(8)  King Mountain wrote a letter to Plaintiff seeking a redetermination of Plaintiff's jeopardy assessment levy and a request for a hearing.  SOF ¶ 39.

(9)  Plaintiff denied these requests by letter to KMT dated March 9, 2012. SOF ¶ 40.

---

[2] It is beyond dispute that K&L Gates is "competent and reputable counsel."

[3] It is beyond dispute that Irwin Schwartz is "competent and reputable counsel." http://ihschwartz.com.

These material facts, taken individually and collectively, were and are evidence that King Mountain relied in good faith on the substantive legal advice of competent and reputable counsel.  Though this Court has since entered an interlocutory order holding that King Mountain's legal justification was insufficient to support its claimed exemption from federal excise taxes, King Mountain's reliance nevertheless constitutes "reasonable cause" and the absence of "willful neglect" sufficient to deny Plaintiff's request that the Court impose penalties under 26 U.S.C. §§ 6651(a)(1) & (2), 6656(a).  *See Kroll*, 547 F.2d at 396 ("Whether or not the taxpayer is liable for taxes is a question of tax law which often only an expert can answer.  The taxpayer not only can, but must rely on the advice of either an accountant or a lawyer.  This reliance is clearly an exercise of ordinary business care and prudence.").  Imposition of penalties, in addition and above any final judgment imposing tax and interest liability would be unwarranted. *Spies v. United States*, 317 U.S. 492, 496 (1943) ("It is not the purpose of the law to penalize frank difference of opinion of innocent errors made despite the exercise of reasonable care.  Such errors are corrected by the assessment of the deficiency of tax and its collection with interest for the delay.").

King Mountain has factually supported its defenses in response to Plaintiff's motion for summary judgment, and Plaintiff has not demonstrated that there is "an absence of evidence" to support King Mountain's defenses.  *Celotex Corp.* 477 U.S. at 323 (1986).  Summary judgment on the issue of penalties, therefore, should be denied.

**V. Any Assessment of Taxes Against King Mountain Would Improperly Subject Allotted Land to a Lien or Forfeiture.**

In an earlier interlocutory order in this case, the Court incorporated by reference its order granting summary judgment against the Yakama Nation in a related case.  ECF No. 62 at p. 2.  One ruling the Court incorporated into this case was a determination that "the *Capoeman* exemption would not apply to taxes owed

by King Mountain" because, the Court reasoned, "the trust property is held for the benefit of Mr. Wheeler, it is not King Mountain's asset, and presumably the property would not be subject to a tax lien."  Case No. 11-3038, ECF No. 149 at p. 12 (citing *Squire v. Capoeman*, 351 U.S. 1, 6 (1956)).  That is, however, not accurate, and impacts the interlocutory ruling on both the "corporate" and "directly derived" issues.

The Yakama Treaty of 1855 provides for allotment lands to be directed "by the President."  Yakama Treaty Article 6.  Today this is viewed as the patent of the land being created in the name of the United States for the benefit of the Native American – Allottee.  The Treaty goes on to provide these lands will be administered "on the same terms and subject to the same regulations as provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable".   The Treaty With The Omaha of March 16, 1854, ratified April 17, 1854 10 Stats. 1043 ("Omaha Treaty"), includes the following language:

> "…And the President may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years; **and shall be exempt from levy, sale, or forfeiture**, which conditions shall continue in force,…

Omaha Treaty, Article 6, Disposition of Lands Reserved, at p. 612 (emphasis added).  Thus, *ab initio* the allotment system contained within the Yakama Treaty contemplated a prohibition against liens, levies or *forfeitures* while still held in trust for the Native American.

Yet imposition of the Cigarette Excise Tax directly imposes a forfeiture and lien against the property as part of its tax provisions in the same Chapter creating the tax.  This is exactly what *Capoeman* found to be an exemption from taxation both as to the language used and as to the preservation of the allotment.  The tax provision states:

**(c) Real and personal property of illicit operators**.--All tobacco products, cigarette papers and tubes, machinery, fixtures, equipment, and other materials and personal property on the premises of any person engaged in business as a manufacturer or importer of tobacco products or cigarette papers and tubes, or export warehouse proprietor, without filing the bond or obtaining the permit, as required by this chapter, together with all his right, title, and interest **in the building in which such business is conducted, and the lot or tract of ground on which the building is located**, shall be forfeited to the United States.

26 U.S.C.A. § 5763 (emphasis added).

The Internal Revenue Code ("IRC) provides for the Cigarette Excise Tax in Subtitle E, chapter 52, 26 U.S.C. section 5701 et seq. Subchapter G provides for Fines, Penalties, and Forfeitures for those who willfully omit, neglect, or refuse to comply with any duty imposed upon that person, including payment of the tax. 26 U.S.C. Section 5701(b). Section 5763 provides that the "**lot or tract of ground on which the building is located, shall be forfeited to the United States**." Subsection (d) then goes on to provide that all property "intended for use in violating the provisions of this chapter, or which has been so used, shall be forfeited to the United States as provided in section 7302." *See* 26 USC § 7302 ("It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property."). This forfeiture language creates the very lien, levy or forfeiture against the allotment that is prohibited in the Treaty and the General Allotment Act.

The cigarette excise tax provides that nonpayment can result in civil penalties, criminal penalties and forfeitures. 26 U.S.C.A. §§ 5761-63. The forfeiture under this section **can occur as to third parties' property and is done without notice and due process of law**. *In re Certain Chevrolet Automobile Bearing New Jersey Registration #IV-42,* 47 F.Supp. 843, 844 (D.C.N.J.1942) (fact that no personal notice of intended forfeiture was given claimant did not require cancellation of forfeiture proceedings); *U.S.v. One 1951 Chevrolet 3/4-Ton Pickup*

*Truck*, 130 F.Supp. 777, 778-79 (W.D.Ky.1955) (The forfeiture of property could be had without worker's having been convicted under this section and § 5763 of this title providing for forfeiture for removal of cigars or cigarettes from any manufactory without the proper stamp thereon).  Specifically, the statute provides … "the lot or tract of ground on which the building is located, shall be forfeited to the United States."  26 U.S.C.A. § 5763 (c).  The last portion of the statute is clearly intended to apply to the ground where the "building is located," independent of ownership.  Forfeitures of third party property were allowed in the above-cited case law.

Article 6 of the Treaty was specifically designed to protect the allotment from any outside charge becoming an "incumbrance" and thereby hindering the United States from conveying to the allottee free and clear title.  This was reaffirmed in the General Allotment Act, 25 USC §§ 348-349.  The Treaty specifically proscribes forfeitures, as stated in article 6.  With regard to the United States role as trustee, the Supreme Court stated the obvious and broad responsibility that:

> There is no doubt that the United States serves in a fiduciary capacity with respect to these Indians and that, as such, it is duty bound to exercise great care in administering its trust." See, e.g., *Seminole Nation v. United States*, 316 U.S. 286, 296-297 (1942).

*United States v. Mason*, 412 U.S. 391, 398 (1973).  In regard to the allotments, the Trustee cannot honor its fiduciary obligation while at the same time, through another branch, impose a tax containing a forfeiture provision.  This is in derogation of its obligations under both the Treaty and the General Allotment Act.

Unlike other cases, including the cases cited by the Court in its earlier decision, King Mountain's failure to pay tax has the effect of directly subjecting the allotment to both lien and forfeiture under 26 U.S.C.A. § 5763 – regardless of whether the manufacturing process results in a product "directly derived" from the allotment.  When the very tax provides for seizure of the allotment, Article 6 of the

treaty is violated by not allowing transfer of land free of "incumbrance" or "forfeiture". This Court reasoned that since the "trust property is held for the benefit of Mr. Wheeler, it is not King Mountain's asset, and presumably the property would not be subject to a tax lien. Therefore, under the reasoning of *Anderson*, the *Capoeman* exemption would not apply to taxes owed by King Mountain." But 26 U.S.C.A. § 5763, while not argued in the earlier briefing, negates this reasoning because it is a direct forfeiture provided in the taxing statute. For example, in imposing the Fuel Excise Tax under Chapter 31 of the IRC in *Ramsey v. U.S.*, 302 F.3d 1074, 1076 (9th Cir.2002), the district court was not faced with a direct forfeiture penalty for violating the payment requirements. Here such a penalty exists in Chapter 52, in derogation of both the Treaty's express protection in Article 6 and the General Allotment Act protections of 25 U.S.C. §§348-49.

*Capoeman* focused on the derived directly requirement because of the diminution in the allotment caused by the timber harvest and the responsibility of the guardian (United States) to not charge the ward (Native American) as part of the diminution of the allotment. Here, the direct forfeiture occurs not from a lien in a foreclosure process, but from a direct diminution of the allotment caused by the very assessment of the tax containing the forfeiture provision. This economic assault on the allotment is different than the income tax because it is automatic and self-contained within the very statute creating the tax. Thus, the "directly derived" analysis does not apply because the encumbrance arises with each tax assessment and not with a failure to pay and the collection process. It does this independent of the ownership of the allotment because the charge of the excise tax to the non-allottee immediately jeopardizes the allotment.

King Mountain's failure to pay the federal excise tax can result in forfeiture of Delbert Wheeler, Sr.'s allotment without notice to him. In its simplest terms, the inclusion of the forfeiture provisions as a direct remedy for failure to pay the

taxes offends Art. 6 of the Yakama Treaty and the very purpose of the General Allotment Act.

## CONCLUSION

The Court should deny Plaintiff's motion for summary judgment on issue 1.

May 23, 2014                           Respectfully submitted,


                                       /s/ John Adams Moore, Jr.
                                       John Adams Moore, Jr.
                                       Adam Moore Law Firm
                                       217 North Second Street
                                       Yakima, WA 98901
                                       (509)575-0372
                                       Fax: (509) 452-6771
                                       Email: mooreadamlawfirm@qwestoffice.net

                                       /s/ Randolph Barnhouse
                                       Randolph H. Barnhouse
                                       Johnson Barnhouse & Keegan LLP
                                       7424 4th Street N.W.
                                       Los Ranchos de Albuquerque, NM 87107
                                       Telephone:  (505) 842-6123
                                       Fax:  (505) 842-6124
                                       dbarnhouse@indiancountrylaw.com
                                       (pro hac vice)

                                       Attorneys for Defendant/Counter Plaintiff
                                       King Mountain Tobacco Co., Inc.

CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2014, I served the foregoing document on the following by e-mail per a written agreement under Rule 5(b)(2)(E):

W. Carl Hankla, Email:  w.carl.hankla@usdoj.gov
Lisa D. Allen, Email: lisa@usdoj.gov

Attorneys for Plaintiff/Counter Defendant

Irwin H. Schwartz, Email:  irwin@ihschwartz.com

Attorney for Plaintiff

s/ John Adams Moore, Jr.
John Adams Moore, Jr.

*King Mountain Tobacco Co., Inc.'s Response in Opposition to Plaintiff's Motion for Summary Judgment on Issue 1*