AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>**2000 FORT SIMCOE ROAD,**<br>**WHITE SWAN, WASHINGTON** | )<br>)<br>)    Case No.  MJ-11-4037-0<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Eastern_____ District of _____Washington_____ *(identify the person or describe property to be searched and give its location)*:

See Attachment A incorporated herein by reference

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:   See Attachment B incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. § _1956; 1341;_ , and the application is based on these facts:           1343; 2342; 2343

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew A. Bullwinkel, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/15/2011

_____
*Judge's signature*

City and state: Yakima, WA

JAMES P. HUTTON, United States Magistrate Judge
*Printed name and title*

# EXHIBIT A

**ATTACHMENT A**
**MJ-11-4037-0**

2000 Fort Simcoe Road, White Swan, Washington, is more particularly described as the manufacturing facilities of King Mountain Tobacco, a privately owned company.  The facility is actually a series of buildings located within a fenced in area outside White Swan, Washington.  The address associated with the business is 2000 Fort Simcoe Road, White Swan, Washington.  The address is marked with a large red sign stating "King Mountain" adjacent to Fort Simcoe Road.  The compound containing all of the buildings is a short drive on a paved and then graveled road South of the sign.  A small light tan guard shack is located next to a chain link gate entrance going into the compound.  Most of the buildings appeared to be tan metal one story warehouse-like structures with light colored roofs.  The compound includes a factory (a taller large metal building), storage warehouses (at least three smaller metal buildings), a main office building (a one story brown stone building with a light blue roof), and several trailers (six double-wide white trailers) used for other administrative functions.  The main building is close to the entrance of the fenced in area and identified by multiple narrow windows along the front of the building and a natural stone facade.  There are total of at least 13 separate buildings within the fenced in area, most bordering a larger dark graveled parking lot.

## ATTACHMENT B
## MJ-11-4037-0

The following items are to be seized when related to the period of September 1, 2008 through the present, whether in electronic or paper format, handwritten, typed, photocopied, stored on computers or computer printouts, disks, diskettes, photo-optical devices, magnetic tape, cassettes, CDs, DVDs, or any other medium:

1)   Books, records, ledgers, journals, statements, receipts, invoices, billings, balance sheets, notes, work papers, charts of accounts, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records and/journals, invoices, bad debt records, cost of goods sold and cost of services provided records, expense and sales invoices, credit and debit memos, billing and revenue records, and analysis and commentary regarding expenditures or income.

2)   All income tax returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, memoranda, letters, correspondence, applications, powers of attorney, and listings which contain financial information, such as income, expenses, assets, liabilities, and transfers of money.

3)   All documents filed with any state or federal regulatory or law enforcement agency or any division thereof, including but not limited to tax stamp requests and tobacco reports.

4)   U.S. currency, bank statements, passbooks, deposit slips, withdrawal slips, canceled checks, bank receipts, bank checks, money order receipts, safe deposit box keys and records, loan records, mortgage company records, and other bank or financial institution records showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency.

5)   Records of purchase and sale of stocks and other securities - statements and receipts; records of real estate transactions - contracts, agreements, settlement sheets, payments and receipts of money; records of loans - contracts, mortgages, promissory and other notes, agreements, applications, payments and financial statements; records of credit cards - statements and receipts; and records of purchase and/or financing of assets, business expenses and living expenses.

1

6)    Employment records and personnel files, including employee lists, applications, forms W-2, 1099, W-4, ledgers, journals, statements, letters, receipts, memoranda, notes, correspondence, employment tax and withholding tax returns, filed or not filed, and supporting worksheets, schedules and analyses used in the preparation of the tax returns and all other documents pertaining to the employment, payment and benefits of personnel.

7)    Records of forming and operating corporations, partnerships, trusts, associations, businesses, and any other entities, along with board minutes, contracts, agreements, books and records, records of payment, bank records receipts, letters, notes and correspondence.

8)    Address books, telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, paper numbers, fax numbers, and telex numbers of possible clients, customers, creditors, financial institutions, accountants, bankers, realtors, mortgage companies, individuals or companies engaged in tobacco sales, State regulators, and other individuals or businesses with whom a financial relationship exists.

9)    Books, magazines, booklets, pamphlets, publications, newsletters, letters, correspondence, tape recordings and other literature concerning Internal Revenue laws, Contraband Cigarette Tax Act laws, or state or federal cigarette tax laws or regulations, and legal interpretations of the laws.

10)   Any documents or records pertaining to any state, federal, or administrative audit of tobacco products.

11)   All travel records of individuals referenced herein to include itineraries, airline tickets, hotel receipts, reservations travel documents or passports evidencing international travel.

12)   Seizure of Computer and Electronic Equipment:

      a)    All computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like

2

binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, network transceivers, recording equipment, RAM or ROM units, acoustic couplets, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b)   All computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software can be stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operation systems, applications, utilities, compilers, interpreters, and communications programs. Any and all programs necessary for the proper functioning of the computer system.

c)   All computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items. These materials include items relating to the operation of the aforementioned hardware or peripherals.

d)   All computer passwords and other data security devices designed to restrict access to or to hide computer software, documentation, or data: including data security devices consisting of hardware (such as encryption devices), software (such as programs that encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data), and programming code (such as code that creates "hot" keys which perform security related functions when activated). Encryption keys or encryption passwords, wherever stored and on whatever medium, including paper or electronic medium.

e)   All related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals. All of the above records, whether stored on paper or magnetic media, such as tape cassette, disk, diskette, or on memory storage devices, such as optical disks, programmable instruments, such as telephone, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession or control of such records.

LEFTWICH DECL. EXH. A, Page 6

f)    Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes network, servers, back-up tapes and diskettes, hard drives, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes and other media which is capable of storing magnetic coding.

g)    Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data.  These devices to computers, computer components, computer peripherals, work processing equipment, modems, monitors, printer, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

h)    Any and all instruction or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components.  The items to be seized could include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware of peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>2000 FORT SIMCOE ROAD<br>WHITE SWAN,  WASHINGTON | )<br>)<br>)<br>)<br>)<br>)    Case No.  MJ-11-4037-0 |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     Eastern     District of     Washington    
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein by reference

     The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein by reference

     I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

     **YOU ARE COMMANDED** to execute this warrant on or before     February 27, 2011    
                                                                            *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

     Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

     The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
               James P. Hutton              .
                               *(name)*

     ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for      days *(not to exceed 30)*.
                                  ☐until, the facts justifying, the later specific date of           .

Date and time issued: 2/15/2011  10:25 am         *[signature]* Jam P. Hutton
                                                           *Judge's signature*

City and state:    Yakima, Washington            James P. Hutton, United States Magistrate Judge
                                                      *Printed name and title*

LEFTWICH DECL. EXH. A, Page 8

Appendix I to Search and Seizure Warrant

Given the quantity and complexity of data that may be found in any digital device to be searched pursuant to this warrant, the need to use a technical specialist to search the digital device(s) or the need of the investigating agent(s) to examine the contents or data in a controlled environment, the investigating agent(s) may, in their discretion, find it necessary to remove digital devices described herein from the location described in Attachment A.

The Court does not find it feasible to conduct the search of said digital devices on the premises described in Attachment A.

## ATTACHMENT A
### MJ-11-4037-0

2000 Fort Simcoe Road, White Swan, Washington, is more particularly described as the manufacturing facilities of King Mountain Tobacco, a privately owned company.  The facility is actually a series of buildings located within a fenced in area outside White Swan, Washington.  The address associated with the business is 2000 Fort Simcoe Road, White Swan, Washington.  The address is marked with a large red sign stating "King Mountain" adjacent to Fort Simcoe Road.  The compound containing all of the buildings is a short drive on a paved and then graveled road South of the sign.  A small light tan guard shack is located next to a chain link gate entrance going into the compound.  Most of the buildings appeared to be tan metal one story warehouse-like structures with light colored roofs.  The compound includes a factory (a taller large metal building), storage warehouses (at least three smaller metal buildings), a main office building (a one story brown stone building with a light blue roof), and several trailers (six double-wide white trailers) used for other administrative functions.  The main building is close to the entrance of the fenced in area and identified by multiple narrow windows along the front of the building and a natural stone facade.  There are total of at least 13 separate buildings within the fenced in area, most bordering a larger dark graveled parking lot.

<u>**ATTACHMENT B**</u>
**MJ-11-4037-0**

The following items are to be seized when related to the period of September 1, 2008 through the present, whether in electronic or paper format, handwritten, typed, photocopied, stored on computers or computer printouts, disks, diskettes, photo-optical devices, magnetic tape, cassettes, CDs, DVDs, or any other medium:

1)   Books, records, ledgers, journals, statements, receipts, invoices, billings, balance sheets, notes, work papers, charts of accounts, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records and/journals, invoices, bad debt records, cost of goods sold and cost of services provided records, expense and sales invoices, credit and debit memos, billing and revenue records, and analysis and commentary regarding expenditures or income.

2)   All income tax returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, memoranda, letters, correspondence, applications, powers of attorney, and listings which contain financial information, such as income, expenses, assets, liabilities, and transfers of money.

3)   All documents filed with any state or federal regulatory or law enforcement agency or any division thereof, including but not limited to tax stamp requests and tobacco reports.

4)   U.S. currency, bank statements, passbooks, deposit slips, withdrawal slips, canceled checks, bank receipts, bank checks, money order receipts, safe deposit box keys and records, loan records, mortgage company records, and other bank or financial institution records showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency.

5)   Records of purchase and sale of stocks and other securities - statements and receipts; records of real estate transactions - contracts, agreements, settlement sheets, payments and receipts of money; records of loans - contracts, mortgages, promissory and other notes, agreements, applications, payments and financial statements; records of credit cards - statements and receipts; and records of purchase and/or financing of assets, business expenses and living expenses.

1

6)   Employment records and personnel files, including employee lists, applications, forms W-2, 1099, W-4, ledgers, journals, statements, letters, receipts, memoranda, notes, correspondence, employment tax and withholding tax returns, filed or not filed, and supporting worksheets, schedules and analyses used in the preparation of the tax returns and all other documents pertaining to the employment, payment and benefits of personnel.

7)   Records of forming and operating corporations, partnerships, trusts, associations, businesses, and any other entities, along with board minutes, contracts, agreements, books and records, records of payment, bank records receipts, letters, notes and correspondence.

8)   Address books, telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, paper numbers, fax numbers, and telex numbers of possible clients, customers, creditors, financial institutions, accountants, bankers, realtors, mortgage companies, individuals or companies engaged in tobacco sales, State regulators, and other individuals or businesses with whom a financial relationship exists.

9)   Books, magazines, booklets, pamphlets, publications, newsletters, letters, correspondence, tape recordings and other literature concerning Internal Revenue laws, Contraband Cigarette Tax Act laws, or state or federal cigarette tax laws or regulations,  and legal  interpretations of the laws.

10)  Any documents or records pertaining to any state, federal, or administrative audit of tobacco products.

11)  All travel records of individuals referenced herein to include itineraries, airline tickets, hotel receipts, reservations travel documents or passports evidencing international travel.

12)  Seizure of Computer and Electronic Equipment:

     a)   All computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like

2

binary devices and other memory storage devices); peripheral
input/output devices (such as keyboards, printers, scanners,
plotters, video display monitors, and optical readers); and
related communications devices (such as modems, cables and
connections, network transceivers, recording equipment, RAM or
ROM units, acoustic couplets, automatic dialers, speed dialers,
programmable telephone dialing or signaling devices, and
electronic tone-generating devices); as well as any devices,
mechanisms, or parts that can be used to restrict access to
computer hardware (such as physical keys and locks).

b) All computer software consisting of digital information
which can be interpreted by a computer and any of its related
components to direct the way they work. Software can be stored in
electronic, magnetic, optical, or other digital form. It commonly
includes programs to run operation systems, applications,
utilities, compilers, interpreters, and communications programs.
Any and all programs necessary for the proper functioning of the
computer system.

c) All computer-related documentation consisting of
written, recorded, printed, or electronically stored material
which explains or illustrates how to configure or use the
computer hardware, software, or other related items. These
materials include items relating to the operation of the
aforementioned hardware or peripherals.

d) All computer passwords and other data security devices
designed to restrict access to or to hide computer software,
documentation, or data: including data security devices
consisting of hardware (such as encryption devices), software
(such as programs that encrypt, compress, hide, or "booby-trap"
protected data to make it inaccessible or unreadable as well as
reverse the process to restore the data), and programming code
(such as code that creates "hot" keys which perform security
related functions when activated). Encryption keys or encryption
passwords, wherever stored and on whatever medium, including
paper or electronic medium.

e) All related communication devices, such as modems,
facsimile machines, telephone equipment with built-in memory
devices, and answering machines, together with system
documentation, operating logs and documentation, software and
instruction manuals. All of the above records, whether stored on
paper or magnetic media, such as tape cassette, disk, diskette,
or on memory storage devices, such as optical disks, programmable
instruments, such as telephone, electronic address books,
calculators, or any other storage media, together with indicia of
use, ownership, possession or control of such records.

f)    Any and all information and/or data stored in the form
of magnetic or electronic coding on computer media or on media
capable of being read by a computer or with the aid of computer
related equipment.   This media includes network, servers, back-up
tapes and diskettes, hard drives, floppy diskettes, fixed hard
disks, removable hard disk cartridges, tapes, laser disks, video
cassettes and other media which is capable of storing magnetic
coding.

g)    Any and all electronic devices which are capable of
analyzing, creating, displaying, converting, or transmitting
electronic or magnetic computer impulses or data.   These devices
to computers, computer components, computer peripherals, work
processing equipment, modems, monitors, printer, plotters,
encryption circuit boards, optical scanners, external hard
drives, and other computer related electronic devices.

h)    Any and all instruction or programs stored in the form
of electronic or magnetic media which are capable of being
interpreted by a computer or related components.   The items to be
seized could include operating systems, application software,
utility programs, compilers, interpreters, and other programs or
software used to communicate with computer hardware of
peripherals either directly or indirectly via telephone lines,
radio, or other means of transmission.

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO: MJ-11-4037-0 |
| | ) | |
| v. | ) | AFFIDAVIT IN SUPPORT OF |
| | ) | SEARCH AND SEIZURE WARRANT |
| 2000 FORT SIMCOE ROAD, | ) | |
| WHITE SWAN, WASHINGTON | ) | |
| | ) | |

| | | |
|---|---|---|
| County of Yakima | ) | |
| | : ss. | |
| State of Washington | ) | |

**<u>AFFIDAVIT</u>**

1.  I, Matthew Allen Bullwinkel, Affiant, being duly sworn,
hereby depose and say that:

I am a Special Agent with the Federal Bureau of
Investigation (FBI).  I have been with the FBI for over eleven
years.  I am presently assigned to the Jackson, Mississippi
Division, Tupelo Resident Agency.  I have training and experience
in federal criminal matters, including Mail Fraud, Wire Fraud,
Money Laundering, Interstate Transportation of Stolen Property,
and violations of the Contraband Cigarette Trafficking Act
(CCTA).  I have participated in numerous Mail Fraud and Wire
Fraud investigations and the execution of search warrants.

1

This affidavit is made in support of a search warrant to be
executed on the manufacturing facilities of King Mountain
Tobacco, a privately owned company.  The facility is actually a
series of buildings located within a fenced in area outside White
Swan, Washington.  The address associated with the business is
2000 Fort Simcoe Road, White Swan, Washington.  The address is
marked with a large red sign stating "King Mountain" adjacent to
Fort Simcoe Road.  The compound containing all of the buildings
is a short drive on a paved and then graveled road South of the
sign.  A small light tan guard shack is located next to a chain
link gate entrance going into the compound.  Most of the
buildings appeared to be tan metal one story warehouse-like
structures with light colored roofs.  The compound includes a
factory (a taller large metal building), storage warehouses (at
least three smaller metal buildings), a main office building (a
one story brown stone building with a light blue roof), and
several trailers (six double-wide white trailers) used for other
administrative functions.  The main building is close to the
entrance of the fenced in area and identified by multiple narrow
windows along the front of the building and a natural stone
facade.  There are total of at least 13 separate buildings within
the fenced in area, most bordering a larger dark graveled parking
lot.

2

The search of King Mountain Tobacco (KMT) for business records and to identify assets of company, is another step in a long chain of events that started with identifying a number of individuals involved with contraband cigarettes in Mississippi. This included Jerry Burke and Randy Benham.  However, the investigation expanded to include manufacturers and distributors in a number of other states that were part of a larger network. This expansion in scope was predicated on: identifying new subjects, schemes, the use of a large scale Undercover Operation (UCO), execution of other search warrants, and then gaining the cooperation of a number of the subjects.  One of those schemes included the diverting of cigarettes manufactured by KMT.  KMT used Mississippi to hide part of their cigarettes sales to a customer in Georgia and avoided some of the costs associated with selling cigarettes.  At least four individuals associated with KMT (Delbert Wheeler, Kamiakin Wheeler, Yancey Black, and JoDe Goudy) participated in some part with the scheme.  The diversion was accomplished through under reporting and false reporting of sales in the business records of KMT as well as required correspondence to State and federal regulators.  A more recent scheme to defraud the federal government out of millions of dollars of taxes has also been discovered.  Based on invoices and reports in the possession of the investigative team, it appears KMT has failed to pay more than 10 million dollars in federal

3

taxes associated with the cigarettes they manufactured and sold into the domestic market. A search of the manufacturing facilities and business offices of KMT will allow the seizing of records, identifying assets, and the preservation of evidence related to the schemes.

This affidavit is also submitted in support of the United States' application for the seizure of any cash and conveyances maintained on site at the business. Evidence will show there is probable cause to believe any such cash or conveyances maintained at the business represent proceeds of illegal activities, as described herein, conducted by Delbert Wheeler, Kamiakin Wheeler, Yancey Black, and JoDe Goudy, doing business as KMT.

## OVERVIEW OF FEDERAL AND STATE CIGARETTE TAXES AND THE MASTER SETTLEMENT AGREEMENT (MSA)

### i) THE MASTER SETTLEMENT AGREEMENT AND REQUIREMENTS IMPOSED FOR NON-PARTICIPATING AND PARTICIPATING MANUFACTURERS

1. At times material to this affidavit, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), administered and enforced the Contraband Cigarette Trafficking Act (CCTA) and ATF regulations pertaining to the shipment, sale or distribution of cigarettes. ATF regulations require that any person who sold, shipped, transferred or otherwise disposed of more than 60,000 cigarettes (which was amended to 10,000 cigarettes on or after March 9, 2006) in a single transaction maintain records of the

4

transaction to include the full name of the purchaser (or the recipient if there is no purchaser), the street address (including city and state) to which the cigarettes were destined, and the quantity of cigarettes involved in the transaction.  At times material to this affidavit, the Alcohol and Tobacco Tax and Trade Bureau (TTB) administered and enforced laws and TTB regulations pertaining to record keeping of operations and transactions by cigarette manufacturers.

2.   Proper and truthful record keeping and documentation as mandated by federal law and regulations are essential to enable ATF to perform its function with regard to the sale, shipment and distribution of cigarettes.  False record keeping impedes performance of ATF's function and unduly hinders the effective administration of justice.

3.   Proper and truthful record keeping and documentation as mandated by federal law and regulations is essential to enable TTB to perform its function with regard to record keeping of operations and transactions by cigarette manufacturers.  False record keeping impedes performance of TTB's function and unduly hinders the effective administration of justice.

4.   It is unlawful under federal law or regulations to conspire to falsify records related to the sale or transport of more than 60,000 cigarettes (or 10,000 cigarettes on or after March 9, 2006), evade Federal Cigarette Excise Taxes, impede a

federal agency's performance of its function or unduly hinder the administration of justice, using the mails, wires or private or commercial interstate carrier in furtherance of a scheme to defraud, or launder money from a specified unlawful activity.

5.   In 1998, forty-six states and six territories entered into a Master Settlement Agreement (MSA) with several major cigarette manufacturers.   The parties intended the settlement to end further litigation between state governments and cigarette manufacturers.   As a part of the settlement, these states and territories released the manufacturers from past and future liability in exchange for the manufacturers' agreement to abide by advertising and promotional restrictions and to make annual monetary payments to these states and territories based on annual cigarette sales.   Under the settlement, the manufacturers' payments to these states and territories were subject to reduction based on lost market share.   The payment was not reduced if the state and territories enacted and enforced a law that required cigarette manufacturers which were not parties to the Master Settlement Agreement (Non-Participating Manufacturers) to make specified annual deposits into an escrow fund based on the number of the manufacturers' cigarettes sold in the state and territories, as measured by state excise taxes applied to such cigarette sales.   Such escrow deposits were intended to establish a source of payment for smoking related health costs paid by the

states and to prevent such manufacturers from deriving large,
short-term profits and then becoming judgment-proof before
liability may arise.  The states' laws also required that such
manufacturers file annual certifications truthfully stating that
the required escrow deposits were made.

6.    The laws of Georgia (for example), a state which was a
party to the Master Settlement Agreement, required that cigarette
manufacturers that were not parties to the Master Settlement
Agreement (Non-Participating Manufacturers) make specified annual
deposits into an escrow fund based on the number of the
manufacturers' cigarettes sold in the state, as measured by state
excise taxes applied to such cigarette sales, and file annual
certifications truthfully stating that the required escrow
deposits were made.

7.    The laws of Georgia (for example) require that persons
authorized to account for such tax regularly and truthfully,
report to the state the number of cigarette packs subjected to
the cigarette tax.  Such reports established the amount the
Non-Participating Manufacturers were to deposit into an escrow
account for the benefit of the state where the manufacturers'
cigarettes were sold.

8.    As used in this affidavit, the term "package" of
cigarettes describes a package of cigarettes which contains 20
cigarettes; the term "carton" of cigarettes describes a carton

7

which contains ten packages (200 cigarettes); and, the term

"case" of cigarettes describes a case which contains 60 cartons

of cigarettes (12,000 cigarettes).

9.   Cigarettes cost the manufacturer between $1 to $2 per

carton to make.   Taxes comprise the major portion of the price

of cigarettes in Mississippi and Georgia (for example), and

numerous taxes are added to the $1 to $2 manufacturing cost per

carton in both Mississippi and Georgia, including a $3.90 Federal

Excise Tax (FET, up until April 1, 2009, when it was raised to

just over $10 per carton) and an estimated 50 cent "Tobacco Buy

Out" tax.

10.   The MSA imposed upon Non-Participating Manufacturers

an additional payment due of approximately $5 per carton on all

cigarettes sold in the MSA states.   Pursuant to the MSA, the tax

imposed is adjusted based on changes in the market and the

participation of additional manufacturers.

11.   Prior to the MSA, in 1996, four states, (Mississippi,

Florida, Texas, and Minnesota; hereinafter referred to as non-MSA

states) which had sued the tobacco industry for increased health

care costs caused by tobacco use in those states, negotiated a

combined $40 billion civil settlement with the tobacco industry.

As such, Non-Participating Manufacturers are not required to make

an MSA payment for cigarettes sold in the non-MSA states,

including Mississippi.

8

12.   A carton of properly taxed cigarettes sold in the non-MSA states is priced less than a carton of properly taxed cigarettes sold in the MSA states.  The imposition of $3.90 in federal taxes, an estimated $0.50 "Tobacco Buy Out" tax, and $5.00 in MSA payments per carton which costs $2 to manufacture would require a carton of cigarettes sold in the MSA states to be priced at more than $11.40 for the manufacturer to make a legal profit.  Most manufacturers, if operating legally, will customarily make a small profit of approximately 50 cents per carton.

13.   The average price of $11.40 per carton in the MSA states is the price *before* the addition of the applicable state taxes (State Excise Tax, SET).

14.   As used in this affidavit, the term "diversion" refers to the movement and distribution of cigarettes in avoidance of federal taxes, state taxes, and MSA payments and in violation of federal cigarette record keeping laws imposed by the Contraband Cigarette Trafficking Act (CCTA) and state licensing and regulatory statutes.  Specifically, this is the movement and distribution of cigarettes through Mississippi (a non-MSA State) to Georgia (an MSA State), for example, in avoidance of federal taxes, state taxes, and MSA payments accomplished through false reporting of the actual cigarette sales in each state.

ii)     **FEDERAL LAW REGARDING CIGARETTE SALES**

1.   Pursuant to federal law, under the Contraband Cigarette
Trafficking Act (CCTA), 18 U.S.C. Sections 2341-2346, the term
"cigarette" means any roll of tobacco wrapped in paper or in any
substance not containing tobacco and any roll of tobacco wrapped
in any substance containing tobacco which, because of its
appearance, the type of tobacco used in the filler, or its
packaging and labeling, is likely to be offered to, or purchased
by, consumers as a cigarette.

2.   Pursuant to federal law (18 U.S.C. Section 2341 (2)), a
quantity of cigarettes in excess of 10,000 (or in excess of
60,000 prior to March 9, 2006) which bore no evidence of payment
of applicable cigarette taxes in the state or locality where such
cigarettes are found, if the state or local government requires a
stamp, impression, or other indication to be placed on packages
or other containers of cigarettes to evidence payment of
cigarette taxes, were contraband cigarettes (hereinafter
contraband cigarettes) if in the possession of any person not
specifically permitted to be in possession of the cigarettes by
federal statute.

3.   Pursuant to federal law (18 USC. Section 2342(a)), it
is unlawful for any person to knowingly ship, transport, receive,
possess, sell, distribute, or purchase contraband cigarettes.

10

4.   Pursuant to federal law (18 USC Section 2342(b)), it is an unlawful act for any person knowingly to make any false statement or representation with respect to the information required by federal law to be kept in the records of any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 (or in excess of 60,000 prior to March 9, 2006) in a single transaction.

5.   Pursuant to federal law (18 USC Section 2343 (a)), any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 (or in excess of 60,000 prior to March 9, 2006) in a single transaction is required to maintain information on business records kept in the normal course of business about the shipment, receipt, sale, and distribution of cigarettes as the Attorney General may prescribe by rule or regulation.  The Attorney General may require such person to keep such information as the Attorney General considers appropriate for purposes of enforcement, including the following:

i) the name, address, destination (including street address), vehicle license number, driver's license number, signature of the person receiving such cigarettes, and the name of the purchaser;

ii) a declaration of the specific purpose of the receipt (personal use, resale, or delivery to another); and

11

iii) a declaration of the name and address of the recipient's principal in all cases when the recipient is acting as an agent.

6.   Pursuant to federal law (18 USC Section 1341), it is unlawful for a person to knowingly and willingly use the mail for the purpose of executing a scheme to defraud federal or state governments of tax revenues or other things of pecuniary value.

7.   Pursuant to federal law (18 USC Section 1343), it is unlawful for a person to knowingly and willingly use interstate wire communications for the purpose of executing a scheme to defraud federal or state governments of tax revenues or other things of pecuniary value.

8.   Per 26 USC Section 5701(b) a tax on tobacco products manufactured in the United States is imposed.  On cigarettes, weighing not more than 3 pounds per thousand, the tax is $19.50 per thousand (and $50.33 per thousand after April 1, 2009).

9.   Federal law (26 USC Section 5703(a)(1)) provides that the manufacturer or importer of tobacco products and cigarette papers and tubes shall be liable for the taxes imposed thereon by Section 5701.

10.  Federal law (26 USC Section 5762(a)) states that whoever, with the intent to defraud the United States:

(2)...Fails to keep or make any record, return, report, or inventory, or keeps or makes any false or fraudulent record,

12

return, report, or inventory, required by this chapter or
regulations thereunder; or

   (3)...Refuses to pay any tax imposed by this chapter,
or attempts in any manner to evade or defeat the tax or the
payment thereof; or

   (4)...Removes, contrary to this chapter or regulations
thereunder, any tobacco products or cigarette papers or tubes
subject to tax under this chapter;

   shall, for each such offense, be fined not more than
$10,000 or imprisoned not more than 5 years, or both.

**iii)  MISSISSIPPI LAWS REGARDING CIGARETTE SALES**

 1. Pursuant to Mississippi Code Section 27-69-13, the
State of Mississippi imposes an excise tax upon the sale, use,
consumption, handling, or distribution of cigarettes in
Mississippi (hereinafter the Mississippi cigarette tax).  As to
every package of cigarettes, the tax required to be paid was 18
cents; this is the equivalent of a $1.80 cigarette tax on each
carton of cigarettes and $108.00 on each case of cigarettes.

 2. Mississippi Code Section 27-69-13 requires a
wholesaler who sold cigarettes in Mississippi to purchase and
affix tax stamps for the cigarettes as payment of the Mississippi
cigarette tax.  Mississippi Tobacco Tax Stamp orders require
completed order forms be signed and mailed, along with check
payments, to the Mississippi State Tax Commission.

3.     Mississippi Code Section 27-69-35 requires every person subject to the Mississippi Tobacco Tax Law to keep an accurate set of records, including invoices, available for inspection, showing all transactions with reference to all cigarettes and tobacco purchased, sold, gifted and stock on hand as well as a record of all stamps purchased.  Pursuant to this same code section, all manufacturers, distributors, and wholesalers of cigarettes who have a permit in Mississippi are required to furnish monthly statements to the State of Mississippi, showing the amount of taxable tobacco received, and must furnish duplicate invoices covering stamps affixed to drop shipments purchased by retailers.

4.     Pursuant to Mississippi Code Section 27-69-37, all wholesalers or retailers engaged in the sale, use, or consumption of tobacco in the State of Mississippi are required to keep and preserve for a period of three years all invoices regarding the purchase of tobacco and stamps.

5.     As used in this Affidavit, the term "tax stamp hoarding" refers to the practice whereby wholesalers make false representations to the State of Mississippi about the number of cigarettes in the wholesaler's possession for sale in order to fraudulently obtain Mississippi tax stamps.  The purpose of "tax stamp hoarding" is for the wholesalers to accumulate rolls of Mississippi tax stamps so that if the price of tax stamps

14

increases, the wholesalers can stamp the tobacco products using the old tax stamps, thereby avoiding payment of additional taxes at the higher tax stamp rate.

6.    The State of Mississippi requires that a wholesaler selling cigarettes in the State of Mississippi file a monthly Tobacco Excise Return indicating the amount of un-stamped cigarettes received that month, the cigarettes available for sale that month, the cigarettes sold to licensed wholesalers and exempt persons that month, the cigarettes shipped or sold out of state, the net taxable cigarettes, and other pertinent information.

7.    Cigarettes actually sold in the State of Mississippi do not require the manufacturer to make an additional payment of $4 to $5 per carton pursuant to the MSA, since Mississippi is a non-MSA State.

8.    Mississippi Code Section 27-69-41 imposes administrative penalties for persons found to have violated provisions of the Mississippi Tobacco Tax Law.  Pursuant to Mississippi law, the keeping of any un-stamped cigarettes or untaxed tobacco at a place of business where tobacco is sold is prima facie evidence of intent to violate the provisions of the Mississippi Tobacco Tax Law.

15

## Facts and Circumstances

1.   The FBI in Mississippi initiated an investigation entitled Major Case 253 which involves violations of the Mail Fraud, Wire Fraud, Money Laundering, and Interstate Transportation of Stolen Property (ITSP) statutes, and violations of the Contraband Cigarette Trafficking Act (CCTA).  This investigation is being worked jointly with Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Tupelo Police Department (TPD), and the Marshall County Sheriff's Office (MCSO).  This investigation's overall goal was to disrupt and dismantle a nationwide network dealing in contraband cigarettes sold into the domestic market.  As a result of avoiding taxes and falsely reporting sales, the network generated millions of dollars in fraudulent income and laundered that money through numerous businesses, assets, and shell companies.

2.   Initially the investigation was aimed at securing evidence of the fraud committed by Jerry Burke, and later Randy Benham, at Globe Distributing, Tupelo, Mississippi.  When Burke owned the business, it was called Globe Wholesale and sold primarily discount or "4th tier" cigarettes to retail stores and other distributors. Benham purchased the business from Burke in October 2006.  Benham also owns another business, Briggs Tobacco, in Memphis, Tennessee, that is another subject of the investigation.  According to sources involved in the investigation and substantial evidence, both individuals were heavily involved in the diverting of cigarettes

16

into the Southeastern region of the United States. Since the start
of the investigation, the number of individuals identified as being
involved in the criminal network has expanded to include
manufacturers and wholesalers in other states.

a. Jerry Burke and Randy Benham, ultimately, entered guilty
pleas to felony charges on November 24, 2009, as a result of their
participation in one of the schemes. Burke has since been
sentenced, while Benham is still awaiting his sentencing.

3. The investigation in Mississippi was a spin-off of another
and still ongoing investigation being conducted by the ATF on the
East Coast. That investigation was initiated with the goal of
stopping the theft of premium brand cigarettes but like the
Mississippi case it was expanded to also include investigating
tobacco diversion and the sale of contraband cigarettes into the
domestic market.

4. On August 9, 2006, a Confidential Human Source (CHS) was
interviewed by law enforcement agents. The CHS was an independent
cigarette broker but had worked with Jerry Burke at Globe Wholesale.
The CHS had years of experience in the tobacco industry and the
discount cigarette market in particular. After a falling out with
Burke, the CHS began arranging the purchase and sale of cigarettes
from his home in Guntown, Mississippi. The information provided by
the CHS has been shown to be accurate, reliable, and the CHS'
information has never proven to be false or misleading.

5.  On January 22, 2007, I interviewed the CHS regarding the CHS' contact with a manufacturer known to participate in the diversion of cigarettes through the State of Mississippi based on evidence already acquired by the investigation.  The manufacturer requested the CHS assist with a tobacco diversion scheme and in turn the CHS told the ATF about it.  Following my interview, the CHS agreed to cooperate with the investigation and collect evidence about the diversion scheme.

6.  On January 25, 2007, I issued the CHS a tape recorder and instructed him to record all telephone conversations pertaining to this investigation.  The CHS was also instructed to keep a detailed log of all telephone calls.  From this date forward almost all of the calls made by the CHS using his cellular telephone were consensually recorded and the number called was documented on the telephone log.  The CHS turned over the tapes and logs to the FBI on a weekly basis.

7.  Between January 2007 and May 2007, the CHS' assistance included conducting face-to-face meetings with subjects as well as telephonic contacts.  This culminated with setting up a warehouse in Mississippi in May 2007, under my instruction, that was actually an authorized Undercover Business on behalf of the FBI.  The business consisted of a warehouse located in Guntown, Mississippi, that was opened as a licensed tobacco wholesaler.  The warehouse then began to deal with a number of individuals interested in

18

contraband cigarettes. The initial customers were sold cigarettes from the scheme with the first corrupt manufacturer. However, most of those customers then requested the CHS' (and the Undercover Business') assistance with new schemes. This included conducting deals with Randy Benham and his company, Globe Distributing. All of the business conducted by the CHS and the Undercover Business involved some form of trafficking in contraband cigarettes.

8. On September 26, 2008, the CHS was contacted by a cigarette wholesaler from Georgia interested in King Mountain brand cigarettes. Those cigarettes were manufactured by King Mountain Tobacco (KMT), White Swan, Washington. Both the wholesaler and KMT were known to the investigation. The wholesaler had been involved in different schemes with the CHS for almost a year. However, this was the first time that the CHS and the Undercover Business would be dealing in any way with KMT. During the first telephone call, which unfortunately was not recorded by the CHS, the wholesaler stated Delbert Wheeler, the owner of KMT, would be calling and they should all do business together. Delbert Wheeler then called the CHS and the CHS recorded the telephone call. Delbert Wheeler initially discussed shipping a truck load of King Mountain brand cigarettes to Georgia with the CHS' assistance. The truck would be fully loaded with 832 master cases (or 49,920 cartons) of cigarettes but some of the product (132 cases) would not appear on the invoice or bill of lading. The additional "unreported" product would bring

down the average cost of the load (from $11 per carton to $9.25 per carton). The "hiding of product" is a direct violation of the record keeping requirements of the CCTA. During follow up telephone conversations the CHS helped arrange the delivery of a truck load of King Mountain cigarettes from Yakima, Washington, to the wholesaler in Georgia. The whole deal was 832 cases of cigarettes valued at $461,760.

a. Delbert Wheeler was later identified as a Yakama Indian male, living at 1200 North White Swan Road, White Swan, Washington. Wheeler is the owner and operator of King Mountain Tobacco, 2000 Fort Simcoe Road, White Swan, Washington.

9. On September 29, 2008, the CHS conducted a consensually recorded telephone call with Yancey Black and Delbert Wheeler. The call concerned the first order of cigarettes being short some cases. During the conversation, the CHS verified Black planned to bill him for $11 per carton for 700 cases but they would really be shipping 832 cases. With a total cost of approximately $462,000 the additional 132 cases would lower the average cost down to $9.25 per carton.

a. Yancey Black was later identified as a white male, living at 4812 East Hillcrest Drive, Yakima, Washington. Black was later revealed to be the General Manager for KMT.

10. On September 30, 2008, a payment was wired to KMT for the load of cigarettes. The wire was sent to King Mountain Tobacco

Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $462,000.00. The address associated with Wheatland Bank is 600 Morgan Street, Post Office Box 960, Davenport, Washington, 9919122.

11.   The CHS later provided copies of the invoice and an "Inventory Pick Ticket" provided with the load shipped by KMT. The invoice was number 4184 and dated October 1, 2008. The invoice states KMT is billing and shipping 700 cases of King Mountain brand cigarettes to The Undercover Business, Guntown, Mississippi. The invoice does not list the other 132 cases of "free" product. The "Inventory Pick Sheet" lists the styles of product sent but there are two columns of numbers with the titles "Bill" and "Promo". The columns add up to 700 cases for column one and 132 for column two. This pick sheet is signed by three individuals. The first two signatures are difficult to read but the first appears to be Justin Strandburg based on other documents received from KMT by the CHS. The last signature appears to be Delbert Wheeler and it appears the load was "Verified By" him.

12.   On October 6, 2008, the CHS met with representatives for KMT at National Association of Convenience Stores (NACS) convention in Chicago, Illinois. The CHS initially met with Yancey Black and JoDe Goudy. During the conversation the KMT representatives explained their manufacturing facility is about 35 miles outside

Yakima, Washington, on the Yakama Indian Reservation with about 63 employees including full-time and part-time workers.  The CHS ended the conversation by agreeing to a potential trip to Yakima to see the facility.

a.  JoDe Goudy was later identified as JoDe Lee Goudy, Yakama Indian male, living at 1310 C Deer Loop, Warm Springs, Oregon. Goudy was later referred to as a Sales Manager for KMT.

13.  Later the same day (October 6, 2008), the CHS again met with representatives from KMT while still at the NACS convention. This meeting included Yancey Black, Kamiakin Wheeler, and JoDe Goudy.  During this conversation, the men from KMT asked the CHS if he does "MSA Reporting" and the CHS stated, "No".  Based on my experience this question was likely meant to determine how the CHS handled the reporting of the sales of the product he brokered and if the cigarettes were being reported to the states' revenue departments.  This assumption was later confirmed through subsequent conversations the CHS had with KMT.  KMT also asked about the potential ordering pattern and stated they wanted to try to increase orders but needed to stay "under the radar".

a. Kamiakin Wheeler was later identified as Kamiakin Timothy Wheeler, a Yakama Indian male, living at 1200 North White Swan Road, White Swan, Washington.  Kamiakin Wheeler is Delbert Wheeler's son.

14.  On Tuesday morning, October 7, 2008, the group again met on NACS convention show floor.  During this meeting the team from

KMT mentioned the restrictions they wanted regarding reported sales. An FBI Agent acting in an undercover capacity and present for the meeting assured the KMT representatives that only the sales they wanted reported would be reported. According to the CHS, the team from KMT seemed to really like this approach. The KMT folks stated they wanted to visit the CHS' warehouse in Mississippi. All of meetings at the NACS convention were consensually recorded by the CHS using a concealed audio and video recording device.

15. On Wednesday, October 8, 2008, the representatives from KMT including Yancey Black (General Manager), JoDe Goudy (Sales Manager), and Kamiakin Wheeler (owner's son) met with the CHS at Undercover Business in Guntown, Mississippi. The CHS later provided a summary of the meeting. The group flew in the night before and stayed in a hotel in Tupelo, Mississippi. At approximately 8:10 AM the KMT folks arrived at the warehouse. After the initial greeting, the group sat down in the CHS' office. According to the CHS, it seemed the group did not really have a specific purpose of the visit only wanting to see the warehouse as well as going over a list of states asking how much volume could be done and how fast. The CHS recapped the deal previously made with the wholesaler in Georgia. Black then stated KMT had been misled by their last distributor and as a result wanted to find a new distributor for their cigarettes. According to Black, KMT wanted to give the CHS the marketing rights to the Southeastern half of the United States.

23

a.   The group then discussed "growing" the brand of King Mountain cigarettes and how they wanted the CHS to report only 20-25% of the sales to a given state.   They indicated they did not care where the CHS sold the product however, they wanted the CHS to stay out of New York as they already had deals with the Oneida Indians, and did not want the CHS to erode the prices.

b.   The group from KMT then asked the CHS about how he got into the business and the CHS explained his background.   The CHS then took the group on a tour of the warehouse.

c.   When the group returned to the office the KMT people asked when they could expect the next orders and how much volume the CHS could move.   The group also discussed the list of approved states where the King Mountain brand cigarettes could be sold.   The KMT people asked about certain states such as California and Arizona after explaining they had a large volume player there and could really do something once the CHS got his account started.

d.   The meeting at the warehouse was recorded on a concealed Closed Circuit Television (CCTV) system and the recordings recovered by the FBI.

16.  The recording of the meeting at the warehouse was reviewed and backs up the CHS' recollection of the events.   The following additional details were identified from the recording.

a.   KMT will sell to the CHS the King Mountain brand cigarettes and if the CHS' customers report the sales to the MSA then KMT will

24

pay the difference up to the MSA level.  They further explained KMT will consider a 25% markup if the customer reports 25% of the sales. KMT also offered to "do some things to keep the price down".  They suggested the CHS could become involved with the deal to sell cigarettes to the Native American Indian Tribes in New York to help spread out some of the sales.  This is likely a reference to falsely reporting some of the sales from the CHS as having been made to a recognized Native American Indian Tribe to help avoid some of the reporting requirements and MSA payments.  KMT explained the Tribe would buy a truckload from KMT when KMT needed help.

b.  During another portion of the meeting it was explained the KMT representatives were offering the CHS a Master Distribution Agreement.  This would involve KMT sending the CHS product on consignment that the CHS would then have to sell.  The CHS stated he preferred to buy only one truckload at a time for a new deal since two truckloads (one fire safe and the other non-fire safe) tied up too much cash.  KMT stated they would like to sell two trucks at a time.

c.  The CHS later explained to KMT a "loophole" they could use to avoid the payment to the MSA.  This was the export/import scheme the CHS had used before (and the basis of the authorized Undercover Operation) to make a lot of money.  The CHS provided a long explanation of the scheme.  It should be noted this was another criminal scheme that the CHS admitted he was participating in and

25

the KMT representatives did not appear to be put off by the admission.

d. The CHS then explained he makes a lot of money on Roll-Your-Own (RYO) since he buys it below market price. The CHS stated he is in a non-MSA state (Mississippi) and diverts it to other states. This was another illegal scheme and again KMT was not put off by the admission. This was another part of the Undercover Operation that the CHS participated in under the direction of the FBI/ATF.

e. The CHS admitted that he "played games" with the reporting to include not reporting sales into MSA states.

f. The CHS expected to sell the one truckload of King Mountain brand cigarettes in 2-3 weeks thru the wholesaler in Georgia.

g. When discussing pricing issues, the KMT representatives said the pricing would be similar to their deal with the Georgia wholesaler. The listed price for cigarettes in an MSA state will be $14.50 per carton but some special deals were possible. For example, $13.50 per carton for first time buyer or free products. They would charge the same price for regular or fire safe. The price for non-MSA states would be $11 per carton but depended on volume and reporting. KMT said they had to make the invoices look "realistic". The CHS said he used "miscellaneous credits" to resolve invoicing issues. This was a reference to showing a higher price on an invoice but then following it with another invoice that

26

lowers the price through a credit to the account.   The CHS then
explained he could bill at the published price but then use "buy
downs" to adjust the price.

17. On October 13, 2008, the CHS both called and faxed Yancey
Black regarding the order of another truck load of cigarettes.   The
facsimile included the following message from the CHS.

> "Yancey,
>     I have attached an order for the King Mountain we
> discussed. As we discussed, on the original order we did
> not order any Ultra Light King, Menthol Light King, or
> Menthol Light 100 to be able to supply the entire line.
> I did want to change this order to include at least a
> token of these styles as well.  If possible please add
> these to the order.
>     Also, please look at my notes as listed below to
> include the free goods etc. on this order.  Please call
> me if you have any questions on this.  Thank you."

The notes include a paragraph that mentioned the free product
provided by KMT on the first truck load of cigarettes.    The
paragraph appears as follows;

> "- $240.00 for price error on the initial invoice
> for $462,000.00 billed for 700 cases = 42,000 cartons @
> $11.000 = $462,000.00 with promotional cases of 132
> cases.  (Our original agreement was for us to be billed
> for a net price of $9.25 @ carton or $555.00 per case or
> $461,760.00)"

Another paragraph referenced even more free goods;

> "-$24,960.00 credit allowance due for 832 cases
> shipped and stamped for Blue Ridge Tobacco @ .50 cents
> per carton as agreed upon with Yancey Black and (the CHS'
> name) to be handled in free goods."

The notes are "totaled" and the final statement appears as
follows;

"$29,700.00 credit due to (the name of the Undercover Business) in free goods = 3,211 cartons or 53.52 cases."

18.   Later on October 13, 2008, $432,060 was wired by the Undercover Business to KMT for the purchase of the new truck load of King Mountain cigarettes.   The price of the cigarettes was reduced by a $24,960 credit for doing the prior deal and another $4,500 "credit" that KMT promised the Georgia wholesaler.

19.   On October 14, 2008, a payment was wired to KMT for the load of cigarettes.   The wire was sent to an account in the name of King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779.   The wire was in the amount of $426,300.00.

20.   The CHS later provided the invoice for the second load of King Mountain cigarettes purchased from KMT.   The invoice was number 4236 and dated October 15, 2008.   The invoice showed billing the Undercover Business for only 646 cases at $11.00 per carton for total of $426,300.00.

21.   Starting on October 20, 2008, the CHS ordered another three truck loads of cigarettes.   Two of the trucks would go to Georgia and one truck would be kept in inventory in Mississippi.

22.   The CHS again conducted a consensually recorded telephone call with Delbert Wheeler on October 30, 2008.   The conversation included Delbert Wheeler mentioning the need for getting the King Mountain brand cigarette into Kentucky.   The use of Roll-Your-Own

28

(RYO) to hide some of the sales was also discussed. Roll-Your-Own tobacco is a term used to describe loose leaf tobacco sold in bags to consumers that wish to make their own cigarettes. Small machines are often used along with paper tubes to create a cigarette similar to a manufactured cigarette. It is my experience that other manufacturers have used RYO on invoices to offset pricing on cigarettes (ie the invoice lists several cases of RYO that were not really shipped to cover the shipping of unreported cigarettes). It is my experience that this was what Delbert Wheeler meant by his suggestion.

23. On October 31, 2008, the CHS conducted another consensually recorded conversation with Delbert Wheeler. During this conversation Delbert Wheeler claimed his payments to the MSA were $97,000 per month. He mentioned this to get the CHS' assistance with keeping his costs down. The CHS told Delbert Wheeler that the CHS and his financial backer, "Lou", would be flying to see Delbert Wheeler around November 13, 2008, on Lou's private aircraft. "Lou" was really a FBI Agent acting in an undercover capacity.

24. On October 31, 2008, a payment was wired to KMT for the load of cigarettes. The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $399,360.00.

29

25.   The CHS later provided the invoice for a load received from KMT.  The invoice was number 4289 and dated November 3, 2008. The invoice shows both King Mountain brand cigarettes (not fire safe) and King Mountain brand RYO.  According to notes provided by the CHS, the Undercover Business was billed for 596 cases at $10.25 per case.  However, they really received 832 cases for an average cost of only $8 per carton.  The CHS was also able to provide the "Inventory Pick Ticket" for this load.  The ticket was dated October 30, 2008, and is signed by both Justin Strandburg and Delbert Wheeler.

26.   Another invoice provided by the CHS shows a similar deal. The next invoice was number 4290 and dated November 3, 2008.  The invoice shows both "fire safe" King Mountain brand cigarettes and King Mountain RYO.  The cigarettes were billed at $10 per carton while the RYO was billed at $9.25 per bag.  According to notes provided by the CHS, the invoice billed the Undercover Business for 613 cases of cigarettes but they really received 832 cases bringing the average cost down to $8 per carton.

27.   On November 4, 2008, a payment was wired to KMT for the load of cigarettes.  The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $392,160.00.

28.   On November 13, 2008, the CHS along with two FBI Agents acting in undercover capacity traveled to Yakima, Washington, to meet with KMT.   The purpose of the trip was to see KMT's manufacturing facility, discuss future business, and to purchase a truck load of cigarettes for cash.   The one Undercover Agent (Lou) was portraying a very wealthy businessman who acted as the financial backer for the Undercover Business.   The group flew to Yakima on a private aircraft to support the illusion that Lou was indeed very wealthy.   The other Agent was introduced as an accountant named "John" who worked for Lou and also assisted the CHS with running the Undercover Business.   Another reason for the trip was Delbert Wheeler was curious to see if Lou would be willing to invest money into KMT to help them make some improvements to their facilities. Digital recording devices were provided to the CHS and the Agents to record the visit.

29.   The CHS later provided, via email, a summary of the trip to Yakima, Washington.   The following are some of the details from that summary:

a.   According to the CHS the day started off with the flight from Chicago arriving in Yakima.   The group was greeted and picked up at the airport by a KMT employee (non Native American Indian) named Jason (no further information) who drove the group to the KMT facility in White Swan, Washington.   The CHS stated White Swan was about 40 miles (45 minutes away driving thru the local mountains in

31

Yakima, toward Adams Mountain (the Indian name for this means King Mountain) and the plant is just outside the little town of White Swan. White Swan is a very small crossroads town. The plant is about 5-6 miles out in the country at the foothills of the mountain. The facility, according to the CHS, itself is very small with the primary building being a galvanized steel metal building about 4,500 square feet that included the manufacturing equipment, some offices, and conference room. Across the parking lot were two trailers for offices, a print shop and one for their marketing offices. The manufacturing equipment was two late model Mark 9 cigarette machines. One of the machines was set up for "King" size cigarettes and the other was set up for "100's" size cigarettes. The equipment was all relatively new, computer controlled, with 2007 production serial numbers. The CHS understood the total capacity of machines were 15,000 cases per month according to Delbert Wheeler. However, they were doing only about 6-7,000 cases per month now. Adjoining the manufacturing building there was a tunnel connecting the plant itself to a storage warehouse. This was another galvanized metal building used to store product. This building was approximately 5,000 square feet. All of the buildings were neat and orderly. The facility "compound" had two electric gates with remote control openers. At the second gate there was a 24 hour a day guard posted. Once inside the gates, the main office building was only about 100 yards from the second gate. The parking lot was all gravel.

32

b.   The CHS explained there appeared to be about 16 people including Delbert Wheeler (Owner), his partner Jaime Aeurto, Yancey Black (General Manager), JoDe Goudy, and Kamiakin Wheeler working in the facility at the time of the visit.

c.   The CHS stated that upon entering the facility, they were greeted by Delbert Wheeler and Jaime Aeurto.  According to the CHS, Aeurto appeared to be Mexican and the CHS was told Aeurto had been partnered with Delbert Wheeler since Delbert Wheeler went into the cigarette business two years ago (2006).  The CHS understood Aeurto was their cigarette expert and the tobacco blender.  Aeurto claimed to have been in the tobacco business for over 25 years working for B & W International.  Also present during the initial meeting were Yancey Black, Kamiakin Wheeler, and JoDe Goudy.

d.   After entering the building the group was shown into the conference room where they sat down for a moment.  However, Delbert Wheeler offered to show the group the plant a short time later and this led to a tour of the facility.

e.   Once back in the conference room, the group sat down and Aeurto made a presentation about KMT and where they wanted to go in the future.  At this point Delbert Wheeler started talking and took over from Aeurto.  Delbert Wheeler then made a pitch to Lou (one of the Undercover FBI Agents) to invest in their company.  Kamiakin Wheeler went to get a laptop computer and showed a presentation on how they had grown their own tobacco.  They claim their soil was

33

excellent and their tobacco would be better than anything grown or sold in the United States today.

f.   They also claimed Phillip Morris (PM) had offered to buy KMT for $25 million dollars so they (PM) could use the Indian Treaty with the US government.  Delbert Wheeler claimed the Indians signed a contract with the US Government years ago allowing them tax free status which would include excluding them from Federal Excise Tax (FET), Tobacco Buy Out (TBO) tax, and the MSA.   (This was later proved to be false and KMT is actually required to pay all of these taxes and fees.  KMT has also been identified as a private company owned by Delbert Wheeler alone, it is not a Tribal Business and has no declared Sovereign Immunity).

g.   Delbert Wheeler then told Lou that Lou could help KMT to grow by investing 72 million dollars in the company and KMT could grow their own tobacco.  This would make them totally tax free from FET, TBO, and MSA.

h.   Delbert Wheeler also explained he felt they had a real opportunity to grow with General Tobacco (another discount tobacco manufacturer located in North Carolina) being on the ropes.  Delbert Wheeler felt KMT could take over the market saying again "remember my cigarettes are not a 4th tier we have product similar to a Marlboro".  Delbert Wheeler then closed out his pitch to Lou by saying this is why he (Delbert Wheeler) needed to grow his business as soon as possible, to be able to handle the volume when General Tobacco fails.

i.   John (the other Undercover FBI Agent) then asked some financial questions.  According to Delbert Wheeler, their profit was normally around 50 cents per carton.  However, Wheeler had sold the CHS and the wholesaler in Georgia four trucks at $8.00 per carton. Delbert Wheeler claimed he lost money on those sales.   Delbert Wheeler further explained his reason for doing this was because the CHS had helped KMT out after another distributor had "screwed him" by promising 10 trucks a month and never delivered any volume. Delbert Wheeler claimed this cost him $ 1.9 million in cash to build the product, add employees, and stockpile finished goods to only sell a couple of truckloads.

j.   According to the CHS the conversation then shifted to KMT asking what was needed for Lou to look at this further and Lou pointed to John who indicated he needed to see the hard numbers. Delbert Wheeler then showed John a three ring notebook about (5) five inches thick that was their marketing plan.   They proudly showed this to John opening it to certain pages and John reviewed the book indicating he needed a copy of this and they agreed to make a copy and send it to him to review.   Unfortunately, the investigation was never able to get a copy of the notebook.

k.   The conversations then shifted again when JoDe Goudy mentioned they already had a problem with people reporting too many sales to Georgia, and Georgia had already caught them in a lie twice.  Goudy stated he needed to get with the CHS on the reporting,

35

and the group needed to be sure they were all on the same page. Delbert Wheeler then wrote 33.3% on the whiteboard on the wall and said this is where we need to be.  Delbert Wheeler emphasized they only wanted 33.3% of their sales reported for MSA purposes.

l.   John (the undercover Agent) then commented, "Yea, I was talking to (the CHS' name) on the plane and we discussed this.  Both your invoices and (the CHS') need to be the same."  Goudy and John then took over the conversation with Goudy saying, "Yea, Georgia is on my butt and we need to discuss this matter."  John got Goudy talking about this and Goudy wanted to come down to Mississippi to meet to amend the invoices so they all matched.  Goudy also suggested they (KMT) make two invoices for the Undercover Business, one for what they received and one to show to the states for auditing purposes, showing only the 33.3% of the product shipped.

m.   Delbert Wheeler then chimed in, "Well, we have to change the $8.00 invoices as not even the TTB could believe they could sell a $8.00 per carton cigarette."  Delbert Wheeler wanted to change some of the prior invoices to show the Undercover Business purchased some RYO bagged tobacco instead of just cigarettes so an auditor would not see the sales of four truckloads at $8.00 per carton.  All of the references to under reporting the sales and changing past invoices are direct evidence of violating the record keeping requirements under the Contraband Cigarette Trafficking Act (CCTA).