n.  John and Goudy then discussed how the group could falsify these reports in detail.  They finally decided both John and Goudy needed to meet in Guntown, Mississippi, on a monthly basis and they set up the first meeting for the week of December 1st.

o.  All participants then took a lunch break.

p.  After lunch, Delbert Wheeler walked up to another white board and wrote out their current state sales and the prices they were selling in each state.  He claimed their current price to everyone is in the $ 10-11.00 per carton range so we (referring to the group in the room) could all make some money.  The CHS commented, "Yea, that's good.  Lou gave me a hard time on the plane saying there was no money in selling the brand now."  Delbert Wheeler asked Lou how much money do you like to make on your investments and Lou commented 30% is normal for him but he was willing to listen to anything as long as the future was there.  Lou then added he really did not care for the cigarette business but the CHS had a good business and was taking in cash.  Lou stated he liked the cash business, that it reminded him of the liquor business that his relatives had in Chicago.  Goudy then asked John in somewhat of a whisper, "You guys Italian?"  John confirmed this with a nod and the room was silent for a moment.

r.  Delbert Wheeler's list was as follows, according to The CHS' notes and memory:

# EXHIBIT A

Palm Springs, CA – Native American Tribes @ $ 11.00

Oklahoma – Creek Indians @ $ 10.25

New York – Oneida, Onondaga, Poospatucks, @ $ 11.00

Washington State both Natives and traditional accounts
(they stamp and sell themselves @ $ 11.00- 15.00 with the stamp)

Nevada - Natives and traditional wholesalers @ $ 11.00

New Mexico - Natives @ $ 10.00@ as well as MRC wholesale

Kentucky -  sold (3) three trucks @ $ 8.25 initially, now
they are selling @ $ 9.25 per carton

However, Delbert Wheeler explained, they had sold four trucks
at $8.00 per carton to the CHS to make up for some problems in the
past and to allow the CHS to make a bigger profit.  As mentioned in
the beginning of this Affidavit the above prices are suspicious
given all of the costs, taxes, and payments to the MSA that are
required.  All of the states mentioned are MSA-states.  However, the
sales to Native American Indian Tribes are often not subject to the
MSA payments requirements.

s.  About this time, according to the CHS, Delbert Wheeler made
the comment, "You know (the CHS' name), we were concerned about you
at first.  We thought you were a cop!"  Lou and John immediately
said "Whoa!" and moved their chairs to opposite sides of the table
away from the CHS.  Delbert Wheeler just looked at the CHS waiting
for a response.  The CHS then said "No, I'm just an old fat white
man in the cigarette business."  Everyone seemed to laugh and

38

Delbert Wheeler commented, well it does not matter "because if you are and you mess with me, I will rip out your eyeball, then I will kill you. You understand you may shoot me but it doesn't matter because in the end we will both go to the same place." According to the CHS, the CHS just commented, "No, I am not a cop!" Delbert Wheeler was not done yet though, and added, "You don't want to fuck with me!" Delbert Wheeler proceeded to tell the group stories about people that he felt had screwed him. He told the group about a couple of men who broke into his 13,000 square foot log cabin house and stole some baskets that were hundreds of years old as well as some guns passed down to him from his father's grandfather that could not be replaced. Delbert Wheeler claimed he found out these men were trying to sell this merchandise and so he caught them, tied them up, and beat them to find out where the goods were kept. Delbert Wheeler went on to claim the men did not tell him so he took them out into the woods and hung them upside down overnight. The next day he beat them until they finally told him where the merchandise was. Delbert Wheeler then said he took the men into town and made them walk in front of his pickup with only their briefs on with him following them blowing the horn.

t. Delbert Wheeler also claimed his brother was "high up in the CIA" and provided Delbert Wheeler with information about people in the tobacco industry.

u.   According to the CHS, the conversation then returned to normal with Delbert Wheeler explaining that they (KMT) wanted to make the CHS their "master distributor".   Wheeler added, "If we worked together, only reporting 33.3% of our sales, they (KMT) would absorb the entire MSA cost to pay the 33.3%" Wheeler then asked the CHS how much volume do you think you can do in 30 days. The CHS told him that was hard to say but realistically, if they could get on the Tennessee's and California's list quickly, they should be able to do 3-4 trucks a month.

v.   Wheeler then said, "We need to only report 33.3% of sales through the 4th quarter.   Then we need to report 50% for the 1st quarter of 2009.   Then go to 100% reporting for (Georgia) as he will really move some volume in the 2nd quarter of 2009.   So we will have to raise our prices then report 100% by 2nd quarter 2009 for Georgia."

w.   The conversation then shifted to the current sales of their brands being primarily to Native American which they confirmed to be correct.   The CHS asked the question about selling into any of these areas, and if that would be a problem.   Delbert Wheeler assured the CHS it was not, however, they did not want the CHS to cut the price.   The CHS could sell as much as the CHS wanted, but he had to control the stamping with Delbert Wheeler circling the 33.3% on the whiteboard.   Delbert Wheeler added, "We have to stay within this number."   The CHS assured them he could control the stamping and reporting.

40

x.  Delbert Wheeler then told the group they were on pace to do $22-25 million in sales this year.  Last year they did $11 million and a little over $5 million the first year.  This was to be their 2nd full year.

y.  Delbert Wheeler asked when the CHS was going to be ready to order again.  Lou said, "Well, that is something we need to talk about."   Delbert Wheeler explained KMT shipped another load this week.   Lou calmly just said, "Okay, well, we've got that issue handled.  So we need to pay you for that order."  Lou then looked at John and said, "Okay. John, let's pay the man." John then reached down to the floor and picked up a briefcase laid it on the conference table, and opened it toward the CHS with it full of bundles of $100 dollar bills.  John then slid the briefcase toward Delbert Wheeler with Delbert Wheeler reaching in and taking out a bundle of cash and counting the bundle while also asking, "How much is this?" John commented that is **40 bundles of $10,000 each for a total of $400,000.**  Delbert Wheeler then started taking out the bundles of cash.  According to the CHS, once the briefcase was empty, Kamiakin Wheeler went into the main office and returned with a large zippered bank bag.  Delbert Wheeler carefully placed all of the money into the bag and handed it to Kamiakin Wheeler, who then zipped the bag up and handed a key to Delbert Wheeler.  Kamiakin Wheeler then laughed commenting this is the first time someone brought us money in a briefcase and added they (KMT) usually get the

41.

money in plastic bags.  Kamiakin Wheeler then asked Delbert Wheeler
where he wanted to put the money.  He (Delbert Wheeler) commented
by saying put it in the safe.

z.  Lou then asked Delbert Wheeler, if he had a way to dispose
of cash as that was a lot of cash to run through the business.
Delbert Wheeler commented, "Yea, it is not a problem. I have a
tobacco store. I presently run about a million dollars through it
a month.  So I can just increase the volume to two million a month
if I need to." Lou just made some sort of comment, "That sure comes
in handy." Delbert Wheeler responded, "Yea, cash is not a problem
for us.  We also have my logging business and I take about $500,000
a month out of it.  So I have ways to handle cash." Lou just
commented that is good to know.  "We like to do business in cash."

aa.  About this time, according to the CHS' summary, the
conversation seemed to die down so Lou made the comment, "Okay. So
what else?"  Delbert Wheeler said, "Well, I think we have about
covered everything."  So Lou said, "Well, I guess we can head back
to the hotel".  Delbert Wheeler then asked Kamiakin Wheeler and JoDe
Goudy, if they were going to take the group to dinner which they
indicated they were.  The conversation then shifted to who was going
to take the group to town, and Aeurto said he would drop everyone
off at the hotel.  The group then all shook hands and walked out to
the car.

bb.  According to the CHS the dinner and the following day were
uneventful.

42

30.   A review of the consensual recording covering the meeting in Yakima, Washington, confirmed the CHS' recollection of the events but also revealed the following additional details.

a.   Following the meeting at the plant and being dropped off at the hotel, Yancey Black picked up the group and took them to dinner.  During the drive Black explained Delbert Wheeler was a customer of John Hunter (no further information) and Black worked for Hunter for 18 years.  Delbert Wheeler hired Black away from Hunter after raids and legal issues at Hunter's business.  Black started with Delbert Wheeler in July 2007.

b.   Black lived in Yakima, two miles east of the hotel. Delbert Wheeler provided Black with a Toyota truck for him to drive.

c.   At the restaurant the group met with Delbert Wheeler, Yancey Black, Kamiakin Wheeler, and JoDe Goudy.  Over dinner Delbert Wheeler discussed distribution by the CHS and who he would sell to and be able to control.  Delbert Wheeler instructed the CHS to find distributors that are not "100% MSA."  Delbert Wheeler also advised the CHS on the amount to charge per carton, setting a price. Delbert Wheeler wanted to get $10-12 per carton.  He wanted to stay under $12 the first year.  Delbert Wheeler then stated he wanted to double in size every year.  He reiterates KMT has grown from 5.9 million to 11.9 million to 25 million this year.

d.   Delbert Wheeler added he had a number of trucks, 2 big semis and 2 delivery trucks.  However, Delbert Wheeler explained he

43

had a load seized near the Police Academy in Oneida, New York. The group discussed the aggressive Attorney Generals in the states of New York and Washington.

e. The CHS stated he thought he could do a truck a week in 60 days. The CHS mentioned he could sell that to the wholesaler in Georgia alone. The CHS also thought another wholesaler in Omaha, Nebraska, could do big volume but could "prostitute" the market. This was a term used to describe selling the product too cheaply and hurting the overall business. Delbert Wheeler indicated he wanted to be able to control the wholesalers. The CHS emphasized the importance of staying on top of the reporting and all agreed. They also agreed that if General Tobacco filed bankruptcy, things could move quickly.

f. The entire conversation was recorded and the recordings are maintained by the FBI.

31. On November 25, 2008, a payment was wired to KMT for another load of cigarettes. The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $399,360.00.

32. On December 1, 2008, Kamiakin Wheeler and Yancey Black traveled to Guntown, Mississippi, to meet with the CHS at the Undercover Business. Also present during the meeting was an FBI Agent ("John") acting in an undercover capacity and portraying an

44

accountant who assisted the CHS. The entire meeting was consensually recorded using a digital recording device and the warehouses's Closed Circuit Television (CCTV) system. The following details were revealed after the recording was reviewed;

a. The meeting mostly concerned reporting strategies in order to dodge MSA payments and "off-the-book" cigarettes being manufactured. The idea was brought up that the "Bill to" and "Sold to" on the invoices would need to be manipulated to back up such reporting. Kamiakin Wheeler had the idea of doing one truck load of cigarettes for cash per month. In regards to the way they were doing business, Kamiakin Wheeler said, "Imagine this 3 years ago, I was thinking everyone went by the book...I've learned so much in 3 years." Kamiakin Wheeler also said, "Sometimes its hard to think..., cause the way I think is like a criminal's mind."

b. Yancey Black explained to "John" that he wanted to change the dates when the wire transfers were received for reporting purposes. Black claimed manipulating these dates would limit the FET tax as well as the "growth" of KMT. This idea of changing the invoices for the purpose of manipulating the FET requirement may explain some of the later activity linked to KMT.

c. John (the Undercover FBI Agent) and Black then proceeded to have an in-depth discussion as to how they will handle future truck deliveries of KMT product. It was agreed that when KMT sent three (3) truck loads, the following pattern would be used: the

first truck would be reported, the second truck would be a cash deal, and the third truck would be sold under an "alias" to disguise the product or it would be sold on the internet.  Black stated he believes KMT could do one and a half trucks per week.  And if sales continued to increase, KMT will be able to do more loads "off-the-books."  John and Black agreed they would need to meet at the beginning or end of each month to ensure that they matched up their figures regarding what they reported.  A final topic discussed by the group was KMT would show on the invoice that the product being sold was RYO and cigarettes when it was actually only cigarettes. This was another method that could be used to hide some parts of the scheme.  All of these substitutions and manipulations of the facts would be further violations of the Contraband Cigarette Trafficking Act (CCTA).

33.  On December 23, 2008, a payment was wired to KMT for the load of cigarettes.  The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $650,000.00.

34.  On January 7, 2009, the CHS met with Delbert Wheeler, Yancey Black, Kamiakin Wheeler and JoDe Goudy at the MGM Grand Hotel in Las Vegas, Nevada.  Also present for the meeting was an Undercover FBI Agent portraying an accountant named John that worked with the CHS.  This meeting included the payment of $415,000 in cash

46

for another load of King Mountain brand cigarettes. The meeting was consensually recorded by the CHS and the recording was later recovered by the FBI. The following details were revealed after the recording was reviewed:

a.  The meeting mostly concerned an old distributor reporting a large amount of the King Mountain brand cigarettes and how Delbert Wheeler was now being asked to pay the MSA for all of the sales. He did not price the cigarettes high enough to afford this, so he was now in need of help or some other solution. Delbert Wheeler claimed he got "stuck" for $1,305,408 in back payments that he had to pay. In addition, there might be another $1,305,408 for a grand total of $2,610,816 that will be owed. The Georgia wholesaler they were supplying got five truck loads and got caught with invoices showing the full amount being sold in Georgia.

b.  Delbert Wheeler told the CHS, per their prior understanding, the CHS was only supposed to report 33 1/3% so if the MSA was $5.25 the CHS should have been charging an extra $1.73 ($5.25 x .33 = $1.73) or $10.98 per carton ($9.25 + $1.73 = $10.98). According to JoDe Goudy, the CHS billed the Georgia wholesaler at the lower price but should have added the 33 1/3% to the price. The CHS said it was his understanding that KMT would take care of the 33 1/3% as long as the CHS only reported 33 1/3%.

c.  According to Goudy, if the CHS wrote a check to KMT for the 33% that would help. However, the CHS said that was not his understanding.

47

d.   KMT then told the CHS they had a problem because they had 11,600 cases of cigarettes in their warehouse.   They just built another warehouse and now they have to charge $13.50 to cover the MSA problem in Georgia.

e.   It is also revealed during the conversation that the Yakama Native American Indian tribe does not own KMT or the cigarettes. King Mountain Tobacco is a private company owned solely by Delbert Wheeler.

f.   The CHS explained he wanted to make at least $.50 per carton profit and his freight averages $0.175 carton.  KMT then said they would sell the cigarettes to the CHS for $10.50 per carton. They added they just notified their wholesale customers that KMT's new non-MSA price would be $11 per carton.

g.   KMT said it is very important that their reports be consistent with the CHS' reports, for example each reporting "only 10% or 20% or whatever."

h.   One of the KMT representatives then stated, "We know that we are diverting and playing games.  We just need to know if you report 30% then we report 30%."

i.   KMT suggests sales from one Indian reservation to another Indian reservation are non-MSA and the paperwork should show this in order to hide some of the sales.  KMT added if the CHS wanted to divert, the KMT paperwork will show that it was a tribal sale and not subject to MSA.

48

j.  Near the end of the recording **the payment of $415,000 in cash** from the CHS and John to KMT is clearly visible.  This was another cash payment for another truck load of the King Mountain brand cigarettes.  All four of the subjects from KMT were present for the transfer of money.

35.  On January 27, 2009, Kamiakin Wheeler and Yancey Black traveled to Guntown, Mississippi, to meet with the CHS at the Undercover Business.  Also present during the meeting was an FBI Agent acting in an undercover capacity and portraying an accountant named John.  The entire meeting was consensually recorded using a digital recording device and the warehouse's Closed circuit Television (CCTV) system.  The following details were revealed after the recording was reviewed;

a.  Kamiakin Wheeler was worried about the reporting in several states including South Carolina. Kamiakin Wheeler also said Georgia was expecting a $692,000 payment.  Kamiakin Wheeler's concerns included other states as well.  In response, the CHS shared his "cheat sheets" with Kamiakin Wheeler as to what he sold in North Carolina; for example selling 280 cases but only reporting 94 cases.

b.  John (the undercover Agent) told Kamiakin Wheeler and Yancey Black he was "done" with getting "jumped" by Delbert Wheeler about being a cop and owing KMT $2.6 million.  The KMT representatives seem to accept this but Kamiakin Wheeler wanted to know if Lou would make a loan to KMT to help pay off the MSA.  John indicated this was still a good possibility.

49

c.   Yancey Black then said KMT now has a 29,000 square foot warehouse and a new 5,000 square foot storage facility for raw materials plus another 17,000 square foot building next to that. Yancey Black explained the cash flow crunch KMT was in after building their warehouse, buying product, and tax problems in Kentucky and Georgia.   KMT had until April to pay in Kentucky. Tennessee was waiting to see what happened in Georgia.   Kamiakin Wheeler said they needed to get their application right in Tennessee before their product would be approved.

d.   Black later discussed the problems on the past loads but mentioned he deleted one of the orders regarding the Georgia wholesaler.  He then stated a "kid" in the office shredded documents and the "pick tickets" at King Mountain because he was nervous about a deal.  Black kept some of the paperwork only because they received payment by wire.  The "pick ticket" dates were "pushed" forward so they did not agree with the invoice date.  Black believed this meant the federal tax payment would not be payable until after they had received payment from the CHS.   Black stated he knew that was a problem, but wanted to ship product.  This is another mention of the Federal Excise Tax (FET) and possible problems at KMT in that area.

e.   The CHS asked about some of the loads that were shipped to Guntown by KMT but were for consignment.  Black stated he "shit canned" that invoice and ultimately it was handled like a cash deal.

50

f.  The group then discussed how easy it would be for future cash deals and that there would be no outstanding balances.  Black stated he took another invoice "off-the-books".  With all the product being shipped, Black said he could not afford to pay the TTB $1.3 million.  Everyone laughed when it was suggested the computer systems might be crashing.  This is a direct statement regarding the avoidance of the FET and possible schemes being used by KMT.  All of these statements will be more relevant as the most recent activity at KMT is discussed later in the Affidavit.

g.  The CHS then called Delbert Wheeler with the group still in the room.  The CHS updated Delbert Wheeler on status of selling product to another cigarette wholesaler in Kentucky.  The CHS stated he had a truck en route and one to be shipped.  Delbert Wheeler then said he got a call from South Carolina regarding a bill of $273,000 instead of $87,000.  Delbert Wheeler claimed he was going to pay based on his numbers.

h.  After the call was completed, Kamiakin Wheeler stated that Delbert Wheeler owned an interest in Spencer Trucking.  Spencer Trucking delivered many of the cigarettes sold to the CHS.  Kamiakin Wheeler further explained Delbert Wheeler provided financing for their trucks.  He did not want his name on it, though.  Delbert Wheeler also owned logging trucks under the name Wheeler Logging.

36.  During the January 27, 2009, meeting Kamiakin Wheeler and Yancey Black also provided the CHS with a series of documents

51

regarding the ongoing scheme.  The documents included copies of the invoices with handwritten notes on them.  All of the invoices appear to have been generated with the assistance of some type of computer system.  The CHS understood these notes were written by Yancey Black.  The following are some examples of the notes:

a.  On the invoice (number 4184) dated October 1, 2008, the handwritten note said, "only billed for 700 cs.  should have been billed for 832 cs @ $9.25 - 461,760.00 (difference of $240.00) over charge deducted from inv# 4236."

b.  On the invoice (number 4236) dated October 15, 2008, the handwritten note said, "Billed for 646 cs @ 11.00 Should have been 832 cs $9.25 = $461,760.00 (difference of $35,400) - 240.00 over charge - 4,500.00 (the name of the Georgia wholesaler)'s credit - 24,960.00 stamping allowance = $5,700.00 Remaining Balance."

c.  On the invoice (number 4289) dated November 3, 2008, the handwritten note said, "Billed for 596 cases should've been 832 @ 8.00 = 399,360.00 (Difference of $7,207.20) (232 cases of RYO Billed out)."

d.  On the second invoice (number 4290) dated November 3, 2008, the handwritten note stated, "Billed for 613 cases should've been 832 @ 8.00 = 399,360.00 (Difference of $29.40)(285 cases RYO Billed out)."

e.  On the invoice (number 4348) dated November 17, 2008, the handwritten note said, "Billed for 750 cases should've been 832 @

9.25 = $461,760.00 (Difference of $177.00) (3 cases of RYO Billed out)."

f.   On the second invoice (number 4349) dated November 17, 2008, the handwritten note said, "Billed for 608 cases should've been 832 @ 8.00 = $399,360.00 (overpayment of $13.20) (65 cases RYO Billed out)."

g.   An "Inventory Pick Ticket" dated November 21, 2008, shows an order for 832 cases of King Mountain brand cigarettes but the handwritten note on the sheet stated, "Not on Statement" and "No Bill."

h.   On the invoice (number 4473) dated December 16, 2008, the handwritten note said, "Billed for 660 cases should've been 832 @ 9.25 = $461,760.00 (Difference of $7.20) (240 cases of RYO Billed out)."

i.   On the invoice (number 4522) dated January 2, 2009, the handwritten notes said, "Cut out of Books" and "832 cases $415,000 cash (Difference of $46,760.00)."

j.   On the invoice (number 4527) dated January 5, 2009, the handwritten notes said, "Cut out of Books" and "728 total cases". The "Inventory Pick Sheet" attached to this invoice also has a handwritten note on it that said, "Not on Statement."

k.   On the invoice (number 4568) dated January 12, 2009, the handwritten note said, "Billed as is! 100 cases."

37. KMT also provided copies of their Quickbooks print showing the "Customer Quick Report." The handwritten notes on this sheet state the following;

```
"Payments on Books  =        $3,190.940.00
 Payments in Cash   =           814,360.00
 Total Amount Received        $4,005,300.00

 Invoice totals on Books   = $3,987,572.40
 Invoice total off Books   = $1,265,160.00
 Total Amount of Invoices  = $5,252,732.40
 Less Amount Received      = $4,005,300.00
 Total Outstanding Balance = $1,247,432.40"
```

Of note, the "Payments in Cash" reference in the notes were the $400,000 in cash paid to KMT during the meeting in Yakima, Washington, on November 13, 2008, and then the $415,000 in cash paid to KMT during the meeting in Las Vegas, Nevada, on January 7, 2009. The use of Quickbooks also suggests at least some of the company's records are being kept or tracked using some type of a computer system.

The notes are all indication of false statements on the invoices and manipulation of the business records regarding the transactions. All of these examples would be violations of the Contraband Cigarette Trafficking Act (CCTA).

38. During the same meeting (January 27, 2009) KMT then provided a memo that summarized all of the transactions and the scheme they had done with the CHS and others. Excerpts from the body of the memo have been transcribed below (the other paragraphs were removed to protect other parties);

"2.   We really need to make sure that everyone
understands the pricing as well.  Currently (the name of
the Undercover Business) is purchasing King Mountains at
$9.25 a carton.   (The name of the CHS) told us that he
needs to make at least $0.50 a carton margin for selling
the product.  The MSA is $5.23 a carton and 33% of which
is reported and equals $1.75 rounded up per carton.

$9.25 = Purchase Price
$0.50 = Mark Up (the Undercover Business' name)
$1.75 = 33% MSA Reporting
$11.50 = Total

Keeping this in mind product billed out on invoices from
(the Undercover Business) should never be invoiced for
less than $11.50 a carton and remember that you're only
reporting 67% of the sale so that amount shouldn't be
reflected on the invoice either.  You will be invoicing
only 33% of the total product sold.  According to our
conversation in Las Vegas you are going to need to bill
out the remaining 67% of your product somewhere and
that's why we offered to turn over our East Coast Tribal
sales to (the Undercover Business) to help alleviate the
billing of that 67%..."

"4.   King Mountain Tobacco wants to make sure that
everyone is clear about the taxes and obligations we have
per truckload of cigarettes that is sold, because (the
name of the CHS) made the reference at our last meeting
that he could get rid of 4 truckloads that would take
care of the MSA obligations that we were facing.

Per 1 Truck Load going out @ $9.25 we received
$461,760.00
{(832cs x 60ctns) x ($9.25) = $461,760.00}

Federal Excise Tax Obligations are @ $3.90 a carton which
comes to $194,688.00   {(832cs x 60ctns) x ($3.90)} =
$194,688.00

Federal Tobacco Buyout Tax @ .54 cents a carton which
comes to $26,956.80  {(832cs x 60ctns) x ($0.54)} =
$26,956.80

```
        194,688            $461,760
     +   26,956.80      -  221,644.80
        $221,644.80        $240,115.20   This is what we can
                                         actually use to pay the
                                         MSA.
```

55

So theoretically, we would have to sell around 8 truck
loads to pay off (the Undercover Business') MSA
obligations.

| $ 240.115.20 | $ 1,920,921.60 |
| x 8 truck loads | - 1,566,489.60 |
| $ 1,920,921.60 | $ 354,432.00 |

The remainder of $354,432.00 will pay for some of our raw
materials and our tobacco loads, so we can continue
cigarette production. We need that little cushion so we
can cover any tax problems that may come up."

"6. Before this all happened with the MSA obligations
and off our conversations in November; we started our
plans for future business with (the Undercover Business)
by building a new warehouse and storage facility to
support the increase in volume that we would have to
start manufacturing. These plans went into effect at the
end of November. The Building at that time was four
months out and we had to pay $500,000.00 just to schedule
the construction and order the materials to build it.
Since then we have had to pay over $200,000.00 with more
added costs to come I'm sure. This doesn't even include
the added costs that we incurred in ordering raw
materials to gear up for this increase in volume as well
which is over $2,000,000.00 in packaging, filters,
tipping paper, inner frame, foil, cellophane, and etc."

"We would like to invite Lou, (the name of the CHS), and
yourself to King Mountain to tour the construction taking
place at this time and to answer any further questions
you might have. We have currently finished a 4800 square
foot storage facility and the concrete slab has been
poured for the new 120' x 240' foot Warehouse and they
should be erecting the steel framework as you read this
letter."

Many of the statements in the memo are direct admission to a

scheme to under report sales of the King Mountain brand cigarettes

to the Department of Revenue in the receiving state in order to help

KMT avoid an obligation to escrow money for MSA. These are all

violations of the CCTA.

56

39.  On January 30, 2009, a payment was wired to KMT for the load of cigarettes.  The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $121,167.20.

40.  For most of the case, the Federal Excise Tax (FET) on cigarettes was $3.90 per carton of cigarettes. However, on February 4, 2009, President Obama signed a bill authorizing an increase in the FET on cigarettes to approximately $10 per carton, an increase of $6.10 per carton.  The increased revenue was "ear marked" to pay for the State Children's Health Insurance Program ("SCHIP").  The SCHIP is meant to generate 71 billion dollars over five years that could be used to provide health insurance to 4 million low income families with children.  The increase was scheduled to go into effect April 1, 2009.

a.  Following the announcement of the increase, the criminal network targeted by the Mississippi investigation began to plan a way to take advantage of it.  The scheme would require a manufacturer or wholesaler to falsely report the sale of cigarettes at the $3.90 per carton level but in reality store the product until the tax increase went into effect.  This false reporting would violate the CCTA and likely produce a Mail or Wire Fraud count as well.  After the increase, the product would be sold into the domestic market at the higher rate (approximately $10 per carton)

to generate a fraudulent profit. Since law enforcement (specifically elements of ATF and the Alcohol and Tobacco Tax and Trade Bureau (TTB)) would be checking inventories held by the manufacturers and large distributors, it would be necessary for the criminal network to find places to "hide" the product. This scheme was later pursued by the investigation after it became apparent some of the subjects were going to do it.

41. On February 5, 2009, another payment was wired to KMT for the load of cigarettes. The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $461,760.00.

42. On February 11, 2009, another payment was wired to KMT for the load of cigarettes. The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $461,760.00.

43. On February 13, 2009, a payment was wired to KMT for the load of cigarettes. The wire was sent to King Mountain Tobacco Company, Post Office Box 422, White Swan, Washington, 98952 via the Wheatland Bank (ABA # 125107697) and to account number XXXX1779. The wire was in the amount of $120,000.00.

44. On February 17, 2009, the CHS provided a copy of a facsimile that the CHS sent to Delbert Wheeler on January 27, 2009.

58

Excerpts from the body of the email have been transcribed below (the

names of a number of the wholesalers that received the product have

been removed);

"Re – King Mountain Cigarettes sales 2008/2009 YTD
Delbert,
        To follow-up on our conversation in Las Vegas last
month I wanted to recap our sales thus far on the King
Mountain cigarette program. This shows you the numbers we
discussed in Las Vegas are simply not correct! Please see
below:

Georgia Sales
- 832 cases 10-03-08
-  28 cases 10-29-08
- 776 cases 10-30-08
-  34 cases 12-02-08
- 561 cases 12-11-08
2,231 cases shipped into Georgia (561 from BT)

Kentucky Sales
- 832 cases 11-03-08
-  31 cases 12-31-08
-  50 cases 11-21-08
-  50 cases 12-12-08
-  50 cases 12-30-08
- 290 cases 01-05-09
-  92 cases 01-09-09
- 237 cases  1-13-09
- 832 cases  1-20-09
2,464 cases shipped into Kentucky (1,451 in 2009)

Indiana Sales
- 50 cases 11-17-08
- 50 cases 12-22-08
- 20 cases  1-15-09
- 28 cases 11-19-08
- 28 cases 12-09-08
- 56 cases 12-22-08
- 27 cases 12-22-08
- 20 cases 12-30-08
- 50 cases 12-31-08
- 28 cases  1-04-09
- 12 cases  1-19-09
- 16 cases  1-23-09
385 cases shipped into Indiana (76 in 2009)

```
South Carolina Sales
- 832 11-24-08
-  33 12-01-08
- 865 cases shipped into South Carolina

North Carolina Sales
- 280 cases 12-22-08

4,137 cases sold 2008 = 248,220 cartons if all sold and
reported at $ 5.20 per carton = Total Liability MSA - NAAG $
1,290,744.00"
```

As can be seen from this facsimile the CHS was advising KMT where the cigarettes were sold (specifically into MSA states).  The email was sent by the CHS to challenge the notion that sales by the CHS were creating new debts for Delbert Wheeler and KMT.  The total amount of product sold by the CHS was used to illustrate the CHS could not be responsible for the over 2 million debt Delbert Wheeler and KMT now owed the MSA.

45.  In March 2009, under the direction of the FBI/ATF, the CHS was directed to set up a new warehouse located near Tupelo, Mississippi.  The new warehouse was approximately 56,000 square feet in size.  When the criminal network started talking seriously about storing product in anticipation of the increase in the Federal Excise Tax (FET), the new warehouse was offered to them.  To help identify this warehouse versus the Undercover Business in Guntown, Mississippi, or Globe warehouse  (Jerry Burke and Randy Benham's business), this warehouse was referred to as the "FET warehouse" by the Agents and the investigation.  Starting the second week of March 2009, loads of cigarettes were directed to be delivered to the FET

warehouse.  Many of these deliveries were supported by false invoices.  Consensual recordings conducted by the CHS with the subjects were also performed to directly tie the loads of cigarettes to the FET fraud scheme.  Shortly after April 1, 2009, approximately 28 truck loads of cigarettes were being stored in the FET warehouse. Based on a rough inventory, there were approximately 855,900 cartons valued at $10,270,800 (or an average cost of $12 per carton). However, after the FET increase those same cigarette would be worth another $5,306,580 (or another $6.10 per carton).  The loads belonged to several known subjects.  King Mountain Tobacco (KMT) did not directly participate in this scheme.  However some of their cigarettes were sent to the FET warehouse by the Georgia wholesaler that was receiving the King Mountain brand cigarettes from the CHS. Based on the evidence collected by the CHS the Georgia wholesaler meant to profit from the FET scheme.

46.  On April 15, 2009, a press release was sent out in Mississippi that stated a warehouse was "discovered" in North Mississippi that contained approximately 20 million dollars worth of "contraband cigarettes".  The cigarettes were suspected to be contraband because most of them did not have any state tax stamps on them.  The report went on to explain the warehouse was "raided" by Agents with the Mississippi Tax Commission, State Auditor's Office, and ATF.  The FBI's role was minimized to protect the larger investigation.  Photographs and video were released showing the

Agents conducting an inventory of the product.  This simulated raid was used to secure the evidence, extricate the CHS from the network, and create an excuse to start contacting a number of the subjects.

a.  The Georgia wholesaler was one of the subjects caught up in this scheme.  That wholesaler was later interviewed and provided documents related to the King Mountain brand cigarettes.

b.  The FET warehouse was also used as a ruse to begin communicating with Delbert Wheeler and KMT.  I (SA Bullwinkel) contacted Delbert Wheeler directly on April 17, 2009, under the guise that some of the King Mountain brand cigarettes were found in am un-licensed warehouse near Tupelo, Mississippi, and they did not appear to have been stamped for Mississippi.  Delbert Wheeler explained he knew some of his product (the King Mountain brand cigarettes) was found in a warehouse in Mississippi based on the pictures and video released after the warehouse was raided.  He went on to claim his products were being diverted into other states without his permission; implying the CHS was mishandling the KMT cigarettes.  During the 55 minute long telephone call Delbert Wheeler lied to me on multiple occasions, not knowing I already knew all of the details regarding KMT's relationship with the CHS.  The call ended with Delbert Wheeler agreeing to send the FBI/ATF copies of all of his invoices for products sent to Mississippi and those sent to Georgia.  Those copies arrived via facsimile to the FBI Oxford Resident Agency (RA), Oxford, Mississippi, late on April 17,

62

2009.  Several of the invoices were changed.  The original purchase price was substituted with a new and false rate.  This also changed the total cost of the of invoices.  These changes would have been discovered because the new total cost will not match the amount of the wires sent to KMT.  Sending the false invoices to me is just further evidence of KMT's willingness to violate the record keeping requirements of the Contraband Cigarette Trafficking Act (CCTA) and commit Wire Fraud.

47.  The next contact with Delbert Wheeler occurred around the end of May 2009 when the corporate attorney for KMT was contacted by myself and advised Delbert Wheeler and the other subjects needed to seek representation in regard to a federal criminal matter.  It was explained to the corporate attorney, Quanta Spencer, that documents were "found" in Mississippi that linked KMT to a scheme to divert the King Mountain brand cigarettes into a number of states.  A package of documents was then sent via facsimile to KMT that included correspondence with the Undercover Business.  Among the documents was a three page memo written by someone with KMT that described the scheme and how they wanted the Undercover business to divert the product in the future.  The conversation ended with the recommendation that Delbert Wheeler, Kamiakin Wheeler, Yancey Black, and JoDe Goudy have their respective legal representatives contact the United States Attorney's Office for the Northern District of Mississippi in Oxford, Mississippi.  They (the individuals) could

then schedule a "reverse proffer" to see some of the evidence against them. A reverse proffer was a practice offered to the subjects in this investigation that involved the showing or playing of some of the recordings associated with the specific schemes and subjects. The individuals are not expected to say anything during the meeting, just listen or watch. An opportunity to cooperate with the investigation and eventually plea to an Information are also discussed.

48. In the case of KMT, a reverse proffer subsequently occurred on June 26, 2009. Attorneys representing Delbert Wheel, Kamiakin Wheeler, JoDe Goudy, Yancey Black, and KMT as a corporate entity attended the meeting. Recordings of telephone calls with the Undercover Operation and meetings with the CHS and Undercover Agents were played for the group. The group was advised that what they were shown was only a sampling of the evidence involving KMT. The meeting ended with the attorneys stating they would speak to their clients and get me an answer regarding the next step in the process.

49. On August 24, 2009, another meeting occurred in Oxford, Mississippi, in regard to the KMT diversion scheme. This meeting included the attorneys but also the subjects Kamiakin Wheeler, JoDe Goudy, and Yancey Black. Delbert Wheeler was not able to attend due to recent medical problems. The group spent the next four days being shown the audio and video records from numerous meetings that occurred between The CHS, Undercover Agents, and representatives

64

from KMT. Following the review of the evidence the attorney for the three subjects indicated they felt the only way their clients would agree to plead guilty would be all four subjects would need to agree to it as a group. In support of this idea the attorney requested at least some of the evidence be made available for Delbert Wheeler to personally witness.

50. On October 14, 2009, a meeting was arranged for Delbert Wheeler and his Attorneys to view the recording of the January 7, 2009, meeting in Las Vegas, Nevada. The recording of this meeting was described in detail earlier in this Affidavit. The Attorneys present at the meeting were Theresa Lynn Keyes (Kirkpatrick & Lockart Preston Gates Ellis LLP, Spokane, Washington) and Grady F. Tollison (Tollison Law Firm, Oxford, Mississippi). According to FBI SA Eric Christensen, that showed the recording to the group, Delbert Wheeler, viewed the approximately two and one half hours of video contained on the recording. Delbert Wheeler appeared relaxed and did not make any unsolicited admissions or statements during the meeting.

51. From October 2009 to the late Fall of 2010 plea negotiations were attempted with a series of attorneys hired by KMT and the four main subjects, Delbert Wheeler, Kamiakin Wheeler, Yancey Black, and JoDe Goudy. However, none of the subjects were willing to accept responsibility for their participation in the scheme to divert the King Mountain brand cigarettes or under report

65

their sales into MSA states.  In the meantime, the investigation focused on other subjects.

52.  On December 14, 2010, a interview was conducted with a cigarette wholesaler in South Carolina.  The South Carolina wholesaler was another subject of the investigation and was involved with a couple of diversion schemes with the Undercover Business. The wholesaler agreed to cooperate in September 2009 with the understanding that his assistance would help mitigate any sentence he ultimately received.  During the December 14th interview, the wholesaler mentioned he had purchased over 20 million dollars worth of the King Mountain brand cigarettes just prior to the State Excise Tax (SET) increase in South Carolina.  Though he was cooperating with the government at the time, these transactions were not conducted on behalf of the government.  They were just legitimate business transactions.  The tax rate on cigarettes in South Carolina was raised from $0.70 per carton to $5.70 per carton on July 1, 2010.  However, no floor tax was applied to the existing inventories of the licensed wholesalers.  Any product in the wholesaler's possession on July 1, represented an additional $5 per carton profit since consumers were now willing to pay for cigarettes at the higher tax rate even though it was not applied to past inventories.  To take advantage of this opportunity, the South Carolina wholesaler had his attorney clear it with the State of South Carolina and then negotiated the purchase of numerous truck loads of cigarettes from

66

KMT.   The wholesaler later provided copies of the invoices and many of the Bills of Lading for the shipments from KMT.   The records showed that between May 2010 and July 1, 2010, the wholesaler purchased 22 truck loads of the King Mountain brand cigarettes each carrying 49,920 cartons (or 832 master cases).   This totaled 149,760 cartons purchased in May 2010 and then 948,480 purchased in June 2010.   A large amount of these cigarettes were "fronted" to the South Carolina wholesaler by KMT to help get the purchases in under the July 1st deadline.   The wholesaler has since been paying KMT about "1 million dollars a month" as he sells off the cigarettes.

      a.   The South Carolina wholesaler's attorneys made sure the wholesaler accurately reported all of the cigarettes and paid the required SET to South Carolina (at the lower rate).   Copies of South Carolina wholesaler's tobacco reports show he reported 948,480 cartons of King Mountain brands cigarettes on his June 30, 2010, report.   It appeared the wholesaler did everything he was required to do regarding the transaction.   However, the idea that the cigarettes were "fronted" to the wholesaler caused suspicions about KMT.   The hard costs involved in the manufacturing and sale of cigarettes meant KMT would have had to have paid at least $11.50 per carton before the cigarettes could leave the factory ($1.50 to make the cigarettes and just over $10 per carton for FET to remove the cigarettes from bond).   For KMT the FET is due the moment the cigarettes are removed due to past payment problems.   They also have

67

to submit a report to TTB for each withdraw.  The sales in May and June 2010 would have required over 10 million dollars in FET by the end of June but KMT was not being paid until after the South Carolina wholesaler sold the products, which would take months. Based on the ongoing financial analysis of KMT and the past deals conducted with the Undercover Business, their ability to absorb these costs appeared unlikely.

53.  On January 27, 2011, the South Carolina wholesaler, via his attorney, provided copies of his bank records showing the payments to KMT.  The statements were then examined for wire payments to KMT during 2010.  The account was held at the First Citizens bank, 1230 Main Street, Columbia, South Carolina.  The following transactions were noted:

| Date | Transaction | Note | Amount |
|------|-------------|------|--------|
| 02/11/10 | Wire Transfer | "Inv 11568" | $731,700.00 |
| 03/03/10 | Wire Transfer | | $898,560.00 |
| 03/17/10 | Wire Transfer | "Inv 11724" | $898,560.00 |
| 04/01/10 | Wire Transfer | "Inv 11838" | $898,560.00 |
| 04/14/10 | Wire Transfer | "Inv 11894" | $898,560.00 |
| 04/15/10 | Wire Transfer | "Inv 11935" | $898,560.00 |
| 04/19/10 | Wire Transfer | MSA Loan | $1,000,000.00 |
| 05/12/10 | Wire Transfer | "Inv 12003" | $898,560.00 |
| 05/27/10 | Wire Transfer | "Inv 12090" | $797,120.00 |
| 06/14/10 | Wire Transfer | "Inv 12136" | $973,440.00 |
| 06/18/10 | Wire Transfer | "Inv 12157" | $973,440.00 |
| 07/12/10 | Wire Transfer | "Inv 12185" | $973,440.00 |
| 08/11/10 | Wire Transfer | "Inv 12207" | $973,440.00 |
| 08/12/10 | Wire Transfer | "Inv 12225" | $973,440.00 |
| 09/17/10 | Wire Transfer | "Inv 12226" | $973,440.00 |
| 10/08/10 | Wire Transfer | "Inv 12227" | $973,440.00 |
| 11/16/10 | Wire Transfer | "Inv 12246" | $973,440.00 |
| 12/10/10 | Wire Transfer | "Inv 12920" | $500,000.00 |
| 12/16/10 | Wire Transfer | "Inv 12920" | $398,560.00 |
| | | | **$16,606,260.00** |

The payments for the cigarettes were being wired to KMT's bank account at Wheatland Bank, Spokane, Washington.  This is the same account that received the payments from the CHS and the Undercover Business (Wheatland Bank (ABA # 125107697) and to account number XXXX1779.)  The last wire transfer related to the purchases in June 2010, was sent on November 16, 2010 in the amount of $973,440 for invoice number 12246.  The wholesaler has since purchased and paid for one more load of cigarettes from KMT on November 24, 2010, with the wire payments being sent on December 10, 2010 ($500,000) and December 16, 2010 ($398,560).  The South Carolina wholesaler explained this last purchase was done to replace some of the faster moving styles of cigarettes in his inventory.  The wholesaler estimates he still owes KMT 9 million dollars with his next payment to be sent in February 2011.

54.  Coordination with TTB and requests through the ATF for all of the payments of FET by KMT for the months of May and June 2010 confirmed they (KMT) paid the FET on only 91,385 cartons for May and 118,326 cartons for June.  However, those payments would have included all of the cigarettes sold by KMT to all of their customers not just the South Carolina wholesaler.  The King Mountain cigarettes are being sold in numerous states and comments from KMT during the past meetings suggested a history of strong sales in New York and Oklahoma.  Sales to other Native American Indians would not help them avoid the FET.  Furthermore, none of the shipments to the

69

South Carolina wholesaler match up to the payments received from KMT for the withdraws of product from bond.   It now appears KMT has not paid any FET to TTB for the loads sold to the South Carolina wholesaler (an estimated $10,982,400 in FET).

55.   The lack of payment of the FET for the cigarettes sold in May and June 2010 to the South Carolina wholesaler raised questions about the sales to the Undercover Business in late 2008 and early 2009.   The requirement to pay immediately for any withdraws from bond was not placed on KMT until late 2009.   Prior to that time they would have had to make an FET payment to TTB every two weeks.   Each payment would cover all of the withdraws that occur during the previous two week period but all of the withdraws would be paid for within the same month (ie a withdraw on the 24th would need to have the taxes paid on the 30th).   The reports would also be monthly instead of identifying every invoice.   An examination of all of the loads shipped by KMT to the Undercover Business revealed they could not have paid all of the FET for the cigarettes, though what was paid for cannot be determined without additional records.   For example in January 2009, KMT shipped the following loads of cigarettes;

| Date | Inv # | Cartons | Rate | Total Cost |
|------|-------|---------|------|------------|
| 01/02/09 | 4522 | 49,920 | $9.25 | $461,760.00 |
| 01/05/09 | 4527 | 43,680 | $9.25 | $404,040.00 |
| 01/12/09 | 4568 | 6,000 | $10.25 | $ 61,500.00 |
| 01/15/09 | 4580 | 49,920 | $9.25 | $461,760.00 |
| 01/24/09 | 4613 | 49,920 | $9.25 | $461,760.00 |
| | | 199,440 | | |

70

The invoices for January 2009, show KMT sold 199,440 cartons of product to the Undercover Business. In addition to these invoices the investigation is in possession of another invoice for a load shipped direct to the Georgia wholesaler. The invoice is dated January 14, 2009, invoice number 4570, shows the sale of 49,920 cartons at $13 per carton for a total cost of $648,960. This would bring the known sales by KMT in January to 249,260 cartons. According to the reports provided by TTB for the payments received by KMT for the month of January 2009, they only paid on 196,221 cartoons of product a difference of 53,139 cartons. Furthermore, these are only the known sales and do not include the likely sales made by KMT to all other customers in the rest of the United States during that month. This shows at least another $531,390 in FET that KMT failed to pay the federal government. The only way to definitively know which loads had the FET paid would be to examine all of the records and invoices for these specific periods of time.

56. An examination of banking records for KMT shows further evidence that the failure to pay the FET for loads leaving the KMT manufacturing facility may not be isolated to just the sales to the South Carolina wholesaler in 2010. The following is a list of the wire transfers and ACH deposits into KMT's account during May and June 2010:

| Date | Amount | Name of Wholesaler |
|---|---|---|
| 05/19/2010 | $19,842.82 | Kansas Candy & Tobacco |
| 05/19/2010 | $12,263.25 | S&K Imports Inc |
| 05/20/2010 | $111,000.00 | Valvo Candies |

71

| 05/27/2010 | $31,522.20 | Ardith Huber |
| 05/27/2010 | $31,552.20 | Ardith Huber |
| | | |
| 06/11/2010 | $138,750.00 | (unknown) |
| 06/14/2010 | $23,310.00 | (unknown) |
| 06/17/2010 | $15,118.20 | Capital Dist |
| 06/22/2010 | $24,420.00 | WFB Direct Pay |
| 06/24/2010 | $32,800.50 | Capital DIst |
| 06/25/2010 | $973,440.00 | Trumpeter |
| 06/29/2010 | $109,890.00 | Capital Dist |

These deposits represent other sales conducted during the
months of May and June 2010.  Once again large payments like the
$973,440 from "Trumpeter" to KMT should have matching payments to
TTB for approximately half the price of the cigarettes (assuming a
sales price of $18-20 per carton).  There are no such payments being
made to TTB during that month.

57.  On January 25, 2011, Justin Strandburg was interviewed in
Oxford, Mississippi.  Strandburg explained he was currently employed
by KMT as an "order taker" and received orders for cigarettes from
a number of customers.  Strandburg dealt primarily with smaller
customers while the "sales guys" handled the larger accounts.  The
orders came in the form of telephone calls, facsimiles, or
electronic messages (email).  Strandburg recognized his signature
on a number of "Inventory Pick Sheets".  Strandburg explained he
generated the pick sheet and sent them to Jim Boyers, the warehouse
manager, who would fill the order.  Strandburg also identified the
Delbert Wheeler that signed the pick sheet was actually one of
Delbert Wheeler's sons, not the owner himself.  Delbert Wheeler, <u>Jr.</u>

72

signed the pick sheet not Delbert Wheeler, Sr., that owns the company. When asked about the "Bill" verses "Promo" columns noted on some of the pick sheets, Strandburg claimed not to know why that was done. However, he did admit that some of the bigger customers of KMT received special pricing for the products they bought and some received an amount of product at a promotional price to help establish markets. Strandburg claimed the name of the Undercover Business and Cormark were the only customers he remembered getting promotional pricing. Cormark was a large distributor in Washington that serviced a number of convenience stores, according to Strandburg. When asked who decided the price a customer would be charged, Strandburg said he thought the "sales guys" made those decisions.

a. Strandburg knew the Federal Excise Tax (FET) needed to be paid for all of the product leaving the KMT facility. He explained the whole facility was considered a bonded area as opposed to just one area of the storage warehouse. I understood this to mean all cigarettes inside the outer fence of the manufacturing facility were considered to be in bond. When the cigarettes leave the facility the taxes would be due. Strandburg did not know about any attempts to avoid paying the FET on cigarettes leaving the facility.

b. Strandburg was also familiar with the need for KMT to escrow money for cigarettes sold into MSA-state. However, he was not involved in that process.

c.   When asked if the business received payments in cash, Strandburg admitted they did.   Strandburg added they had local "tribal" customers that paid with cash.   He also estimated the payments were "in the 10s of thousands of dollars".   Strandburg said the cash received by KMT was then placed in a safe in Delbert Wheeler, the owner's, office.

d.   Strandburg was able to provide a sketch of the KMT manufacturing compound and noted the purpose of many of the buildings.   His sketch identified factory area, the stamping area, and storage facilities.   Strandburg's sketch noted the use and location of the separate rooms in the main building.   He was also able to identify that the records of the business were primarily kept in a room he label "bookkeeping" on his sketch.   This was located in Southeast corner of the main office building.   Strandburg added the records for the last few years would be kept in that office while the older records were moved to one of the trailers on the compound for storage.   The record storage trailer is located behind another trailer Strandburg label as the "print shop". Strandburg indicated Delbert Wheeler's office (and the safe) was along the West wall of the main building while discussing the sketched diagram.

58.   On January 25, 2011, Jaime Aeurto was interviewed in Oxford, Mississippi.   During that interview, Aeurto provided the following details about KMT's operation.   Aeurto is employed as the

74

tobacco blender for KMT.   In that capacity he supervises the planting, cultivating, harvesting, and mixing of the tobacco that goes into the King Mountain brand cigarettes.   Aeurto explained he worked primarily at a separate facility where the tobacco greenhouses and fields were located about 25 miles from the main manufacturing facility.   However, Aeurto has been to the manufacturing facility a number of times.   Aeurto was not familiar with the reporting requirements nor the exact methods used by KMT to track the sales of their cigarettes.   However, Aeurto did know some information about the production capabilities of KMT.   Aeurto explained the King Mountain brand cigarettes were made using approximately 20% locally grown tobacco, that he supervised, and the rest of the tobacco is purchased from Alliance One, in North Carolina.   Aeurto stated KMT runs their product lines for only one shift a day and only five days a week.   He also estimated KMT could produce about 80 master cases of cigarette a day.

a. Despite not working at the main manufacturing facility full time, Aeurto was able to provide a sketch of the KMT compound and listed what each building was used for as best as he could remember. Aeurto's sketch showed the location of the main building and the offices inside it.   The factory building including the location of the manufacturing equipment and stamping room were also noted. Aeurto did not indicate the exact location of the records, however.

b.  Aeurto was asked about being at the meeting with the CHS
and the two FBI Undercover Agents on November 13, 2008.  Aeurto
remembered doing a presentation for some men from out of town that
were potential investors in the business.  However, Aeurto did not
remember exactly who they were.  Aeurto did remember seeing the men
pay Delbert Wheeler some amount of cash but Aeurto was not sure how
much it was.  Aeurto claimed this was the only time he saw some one
pay Delbert Wheeler using cash.  Aeurto also remembered driving the
visitors to their hotel following the meeting at the business.

59. Since it is required that a business dealing in quantity
of cigarettes in excess of 10,000 in a single transaction maintain
business records regarding the shipment, receipt, sale, and
distribution of cigarettes it is likely the evidence of the above
mentioned transactions will be at King Mountain Tobacco's
manufacturing facility.  The absence of the records at the business
would generate other violations because the preservation of the
records is required by law.

### LOCATION TO BE SEARCHED

For the above reason, I have probable cause to believe
that evidence related to Mail Fraud, Wire Fraud, Money Laundering
and violations of the Contraband Cigarette Trafficking Act (CCTA)
can be found at the manufacturing facilities of King Mountain
Tobacco, a privately owned company.  The facility is actually a
series of buildings located within a fenced in area outside White

76

Swan, Washington.  The address associated with the business is 2000
Fort Simcoe Road, White Swan, Washington.  The address is marked
with a large red sign stating "King Mountain" adjacent to Fort
Simcoe Road.  The compound containing all of the buildings is a
short drive on a paved and then graveled road South of the sign.
A small light tan guard shack is located next to a chain link gate
entrance going into the compound.  Most of the buildings appeared
to be tan metal one story warehouse-like structures with light
colored roofs.  The compound includes a factory (a taller large
metal building), storage warehouses (at least three smaller metal
buildings), a main office building (a one story brown stone building
with a light blue roof), and several trailers (six double-wide white
trailers) used for other administrative functions.  The main
building is close to the entrance of the fenced in area and
identified by multiple narrow windows along the front of the
building and a natural stone facade.  There are total of at least
13 separate buildings within the fenced in area, most bordering a
larger dark graveled parking lot.

### COMPUTERS

1. As detailed above, it is my belief that any number of the
items sought in this affidavit may be found stored electronically.
Based on my experience, I also know that electronic evidence can be
moved easily from one computer or electronic storage medium to
another.  As a result, I believe that electronic evidence may be

stored on any computer or electronic storage medium present at the search site.

2. In addition, based on my training and experience, I know that in most cases it is impossible to successfully conduct a complete, accurate, and reliable search for electronic evidence stored on a computer or other electronic storage media during the physical search of a search site. This is true for a number of reasons, including but not limited to the following:

(a)  Technical Requirements:  Searching computers and other electronic storage media for criminal evidence is a highly technical process requiring specific expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in particular systems and applications, so it is difficult to know before a search which expert is qualified to analyze the particular system(s) and electronic evidence found at a search site. As a result, it is impossible to bring to the search site all of the necessary personnel, technical manuals, and specialized equipment to conduct a thorough search of every possible computer system. In addition, electronic evidence search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from

78

external sources or from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to ensure its complete and accurate analysis.

(b)   Volume of Evidence:   The volume of data stored on many computers and other electronic storage media is typically so large that it is impossible to search for criminal evidence in a reasonable period of time during the execution of the physical search of a search site.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing sixty gigabytes [this number needs to be updated, probably] of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 30 million pages of data, which, if printed out, would completely fill a 20' x 24' x 10' room to the ceiling.  Just duplicating a single, sixty megabyte hard drive under laboratory conditions in a manner that ensures that an accurate forensic image has been made takes at a minimum several hours and, in certain cases, can take up to a full day to complete.

(c)  Hidden or Obfuscated Evidence.  Computer users can conceal data within computers and electronic storage media through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often

79

are image files; however, a user can easily change the extension to
".txt" to conceal the image and make it appear as though the file
contains text. Similarly, computer users can encode communications
to avoid using key words that would be consistent with the criminal
activity. Computer users also can attempt to conceal electronic
evidence by using encryption technologies. For example, some
encryption systems require that a password or device, such as a
"dongle" or "keycard," be used to obtain a readable form of the
data. In addition, computer users can conceal electronic evidence
within another seemingly unrelated and innocuous file using a
process known as "steganography." For example, by using
steganography, a computer user can conceal text in an image file in
such a way that it cannot be read when the image file is opened
using ordinary means. As a result, law enforcement personnel may
have to search all the stored data to determine which particular
files contain items that may be seized pursuant to the warrant.
This sorting process can take a substantial amount of time,
depending on the volume of data stored and other factors.

(d) Deleted or Downloaded Files. Computers and other
electronic storage media allow suspects to delete files to attempt
to evade detection or to take other steps designed to frustrate law
enforcement searches for information. However, searching
authorities can recover computer files or remnants of such files
months or even years after they have been downloaded onto a hard

drive, deleted, or viewed via the Internet.  When a person "deletes" a file on a home computer, the data contained in the file do not actually disappear; rather, the data remain on the hard drive until they are overwritten by new data.  As a result, deleted files, or remnants of deleted files, may reside in free or "slack" space (i.e., in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space) for long periods of time before they are overwritten.  A computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve the residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

3. In accordance with the information in this affidavit, law enforcement personnel will execute the search of computers systems seized pursuant to this warrant as follows:

a.   Upon securing the search site, law enforcement personnel will seize the computer systems and transport them to an appropriate law enforcement laboratory for review.  The computer systems will be

reviewed by appropriately trained personnel to extract and seize any data that falls within the list of items to be seized pursuant to the warrant.

b.   In order to search fully for the items identified in the warrant, law enforcement personnel may examine all of the data contained in the computer systems to view their precise contents and determine whether the data fall within the list of items to be seized pursuant to the warrant.   Because of the above-described technical requirements, volume of evidence, and the ability of suspects to delete, download, hide and/or obfuscate evidence, the analysis of electronically stored data may entail any or all of several different computer forensics techniques.   Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

82

4. If searching authorities determine that none of the data contained on a computer system fall within any of the items to be seized pursuant to the warrant, law enforcement personnel will return the computer system within a reasonable period of time, unless further authorization is obtained from the Court.

## ITEMS TO BE SEIZED

The following items are to be seized when related to the period of September 1, 2008 through the present, whether in electronic or paper format, handwritten, typed, photocopied, stored on computers or computer printouts, disks, diskettes, photo-optical devices, magnetic tape, cassettes, CDs, DVDs, or any other medium:

1) Books, records, ledgers, journals, statements, receipts, invoices, billings, balance sheets, notes, work papers, charts of accounts, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records and/journals, invoices, bad debt records, cost of goods sold and cost of services provided records, expense and sales invoices, credit and debit memos, billing and revenue records, and analysis and commentary regarding expenditures or income.

2) All income tax returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, memoranda, letters, correspondence, applications, powers of attorney, and listings which contain financial

83

information, such as income, expenses, assets, liabilities, and transfers of money.

3)   All documents filed with any state or federal regulatory or law enforcement agency or any division thereof, including but not limited to tax stamp requests and tobacco reports.

4)   U.S. currency, bank statements, passbooks, deposit slips, withdrawal slips, canceled checks, bank receipts, bank checks, money order receipts, safe deposit box keys and records, loan records, mortgage company records, and other bank or financial institution records showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency.

5)   Records of purchase and sale of stocks and other securities - statements and receipts; records of real estate transactions - contracts, agreements, settlement sheets, payments and receipts of money; records of loans - contracts, mortgages, promissory and other notes, agreements, applications, payments and financial statements; records of credit cards - statements and receipts; and records of purchase and/or financing of assets, business expenses and living expenses.

6)   Employment records and personnel files, including employee lists, applications, forms W-2, 1099, W-4, ledgers, journals, statements, letters, receipts, memoranda, notes, correspondence, employment tax and withholding tax returns, filed or not filed, and supporting worksheets, schedules and analyses used in the

84

preparation of the tax returns and all other documents pertaining to the employment, payment and benefits of personnel.

7)   Records of forming and operating corporations, partnerships, trusts, associations, businesses, and any other entities, along with board minutes, contracts, agreements, books and records, records of payment, bank records receipts, letters, notes and correspondence.

8)   Address books, telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, paper numbers, fax numbers, and telex numbers of possible clients, customers, creditors, financial institutions, accountants, bankers, realtors, mortgage companies, individuals or companies engaged in tobacco sales, State regulators, and other individuals or businesses with whom a financial relationship exists.

9)   Books, magazines, booklets, pamphlets, publications, newsletters, letters, correspondence, tape recordings and other literature concerning Internal Revenue laws, Contraband Cigarette Tax Act laws, or state or federal cigarette tax laws or regulations, and legal  interpretations of the laws.

10)  Any documents or records pertaining to any state, federal, or administrative audit of tobacco products.

11)  All travel records of individuals referenced herein to include itineraries, airline tickets, hotel receipts, reservations travel documents or passports evidencing international travel.

12)  Seizure of Computer and Electronic Equipment:

85

a)   All computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, network transceivers, recording equipment, RAM or ROM units, acoustic couplets, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b)   All computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software can be stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operation systems, applications, utilities,

86

compilers, interpreters, and communications programs. Any and all programs necessary for the proper functioning of the computer system.

c)   All computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items. These materials include items relating to the operation of the aforementioned hardware or peripherals.

d)   All computer passwords and other data security devices designed to restrict access to or to hide computer software, documentation, or data: including data security devices consisting of hardware (such as encryption devices), software (such as programs that encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data), and programming code (such as code that creates "hot" keys which perform security related functions when activated). Encryption keys or encryption passwords, wherever stored and on whatever medium, including paper or electronic medium.

e)   All related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals. All of the above records, whether stored on paper or magnetic media,

87

such as tape cassette, disk, diskette, or on memory storage devices,
such as optical disks, programmable instruments, such as telephone,
electronic address books, calculators, or any other storage media,
together with indicia of use, ownership, possession or control of
such records.

f)   Any and all information and/or data stored in the form of
magnetic or electronic coding on computer media or on media capable
of being read by a computer or with the aid of computer related
equipment.  This media includes network, servers, back-up tapes and
diskettes, hard drives, floppy diskettes, fixed hard disks,
removable hard disk cartridges, tapes, laser disks, video cassettes
and other media which is capable of storing magnetic coding.

g)   Any and all electronic devices which are capable of
analyzing, creating, displaying, converting, or transmitting
electronic or magnetic computer impulses or data.  These devices to
computers, computer components, computer peripherals, work
processing equipment, modems, monitors, printer, plotters,
encryption circuit boards, optical scanners, external hard drives,
and other computer related electronic devices.

h)   Any and all instruction or programs stored in the form of
electronic or magnetic media which are capable of being interpreted
by a computer or related components.  The items to be seized could
include operating systems, application software, utility programs,
compilers, interpreters, and other programs or software used to

communicate with computer hardware of peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

I, therefore, respectfully request that the court issue a warrant authorizing the search of the business and the seizure of the relevant evidence.

MATTHEW A. BULLWINKEL
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this ___15___ day of February, 2011.

JAMES P. HUTTON
UNITED STATES MAGISTRATE JUDGE

89